**BANK LEUMI TRUST COMPANY OF NEW YORK, Plaintiff,**

v.

**BALLY'S PARK PLACE, INC., Defendant.**

**No. 81 Civ. 3931–CLB.**

United States District Court, S. D. New York.

Dec. 1, 1981.

Parker, Chapin, Flattau & Kimpl, New York City, for plaintiff; Stephen Harmon & Michael Friedman, New York City, of counsel.

Bressler, Lipshitz & Rothenberg, New York City and Sills, Beck, Cummis, Zuckerman, Radin & Tischman, Newark, N. J., for defendant; Morton S. Bunis, Newark, N. J., of counsel.

## MEMORANDUM AND ORDER

BRIEANT, District Judge.

In this diversity action between a bank and the proprietor of a gambling casino, the Court is called upon to decide where the loss or damage, as between the payee-depositor of a check known to be bad, on the one hand, and a drawee bank guilty of comput-

er induced negligence, on the other hand, shall be imposed. The Court believes that there is nothing in the Uniform Commercial Code or prior New York caselaw which requires the Bank to suffer the resultant damage as between the parties.[1]

The relevant facts, stated below, are not in dispute. Plaintiff's motion for summary judgment is granted and defendant's motion for the same relief is denied.

Defendant Bally's Park Place, Inc. ("Bally's"), is a New Jersey corporation which is the proprietor of a gambling casino located at Atlantic City, New Jersey. Plaintiff Bank Leumi Trust Company of New York ("the Bank" or "Bank Leumi"), is a commercial bank and trust company incorporated under the laws of the State of New York. The Bank had a checking account customer, one Allen Brinker, a resident of New York.

In June 1980, Brinker visited Atlantic City and took a walk on the Boardwalk, followed by a bath at Bally's. He issued a personal check drawn on his account at Bank Leumi in the amount of $60,000, payable to Bally's to cover the markers for his gambling losses.

In order to shuffle and process the vast amount of paperwork which checks of retail banking customers entail, all United States banks today process checks drawn by their customers by computer. They do this by issuing specially imprinted checks to bank customers. These pre-printed checks contain numbers along the bottom of the face of the check identifying the customer's bank, branch and account number. Such numbers are printed or "micro-encoded" in magnetic ink, which is capable of being read by computers without the intervention of human hands, eyes or minds. When such a check is then deposited by the payee with a collecting bank, the collecting bank further imprints the check with computer readable magnetic ink identifying the amount of the check. If the check has been deposited with a collecting bank out of the area of the drawee bank, as occurred in this

---

1. Concepts having to do with bona fide holders of negotiable paper in due course without no-

tice are not involved in this litigation. See New York U.C.C. § 3 -302.

case, the check is then processed through the Federal Reserve Bank system.

During the processing two things take place: the check is physically transferred to the drawee bank, and a credit for the amount of money due on the check is transferred by computers from the account of the maker at the drawee bank to the account of the payee at the collecting bank.

On Saturday evening, June 7, 1980 and early Sunday morning, June 8, 1980, while Brinker was gambling at Bally's, he issued several checks or markers to Bally's in return for gambling chips. Brinker had in previous months incurred debts to Bally's of $22,000, $22,100 and $40,000, which were promptly satisfied, and Bally's was therefore willing to extend him further credit. In the early morning hours of Sunday June 8, 1980, Brinker issued a single check drawn on Bank Leumi for $60,000 to Bally's to consolidate and replace the earlier smaller markers issued during Saturday night and Sunday morning.[2]

Neither this consolidation check nor the earlier smaller checks were issued on the ordinary pre-printed, numbered and computer readable check forms provided by Bank Leumi to its customers, including Brinker. Instead, an ordinary blank form check prepared for Bally's was used. This check form showed the words "Bally's Park Place Casino Customer Check," printed on the top and Bally's logo printed on the background. The payee was pre-printed as "Pay to the Order of Bally's Park Place, Inc."[3]

On this blank check furnished by Bally's were written in ink the name of the drawee bank, its location, its American Banking Association identification number, the amount of the check and the name, address and signature of Brinker. This check was completed at two different times and it appears that two or three different persons filled in different portions of the check.[4] In one handwriting are the words "Bank of Leumi," Bank Leumi's American Banking Association identification number, the words "Consolidation Check," the date "6–7–80," the amount, and Brinker's printed name. In what appears to this Court to be another handwriting, is Brinker's signature. In the latter entry and possibly still a third handwriting are Brinker's address and the location of his branch of Bank Leumi. It is likely that Bally's filled out the name of Brinker's bank, his account number, Bank Leumi's identification number, the date, the amount and printed Brinker's name and gave the check to Brinker for him to sign. At some later time Bally's then added Brinker's address and the location of his branch of Bank Leumi. Since this was not a pre-printed check and since Brinker's account number and banknumber were handwritten, this check was not computer readable.

2. Although this "Consolidation Check" was issued by Brinker on Sunday morning, June 8, 1980, it was dated Saturday, June 7, 1980. The check was pre-dated to the date of the first obligation which it consolidated, apparently so as to comply with the provisions of N.J.S.A. § 5:12–101 which prohibits the use of a consolidation or later check to change the running of time by which the later check must be deposited. N.J.S.A. § 5:12–101(c). This fact is of no relevance to this action.

3. The blank form check may have been used because Brinker did not have any of his pre-printed Bank Leumi checks with him. Many regular gamblers follow the custom and habit of not carrying checks when gambling, so as to minimize the temptation to risk more than the cash on their person. To meet this well known practice, Bally's apparently had printed its own form of blank check for use by such customers including Brinker.

4. It is clear that the check was completed at two different times because the photocopy of the check sent to Brinker's named executor on July 15, 1980 does not include Brinker's address or the location of his branch of Bank Leumi (Ex. B to Wohl Affidavit), yet these items appear on the check when it was microfilmed by Bank Leumi (Ex. 1 to D'Amato Affidavit).

It is evident that this copy of Brinker's check was made at least twelve hours after the check was signed by Brinker in the early morning hours of Sunday, June 8, 1980, because it contains a time and date stamped by Bally's made at "Jun 8 5:25PM '80." This copy may have been made as late as July 15, 1980, when it was mailed to Wohl.

On June 27, 1980, Brinker cashed in his chips for the last time, apparently leaving an insolvent estate of less than $5,000.00. Somehow, Bally's became aware of Brinker's death shortly thereafter. On July 7, 1980 Brinker's account at Bank Leumi was closed.

On or before July 15, 1980, Brinker's attorney and named executor Ronald Wohl, received a call from Bally's seeking to collect the $60,000.00 from Brinker's estate. Wohl informed Bally's that there was less than $5,000.00 in the estate, that the estate would not even be able to pay Brinker's burial expenses, and that there were no funds from which to pay Bally's claim. Wohl found it surprising that Bally's extended Brinker $60,000 in credit because Brinker had been adjudicated as a bankrupt two years earlier and was generally unable to obtain credit. He had only one credit card, from Avis Rent-A-Car.

On July 15, 1980, Bally's submitted a formal claim against the estate for $60,-000.00.

On Saturday, September 6, 1980, Bally's prepared a large deposit which included Brinker's check. This deposit was picked up by the armored car service for Bally's bank, the First National Bank of South Jersey (the "collecting bank"). The check was processed by the collecting bank on Monday, September 8, 1980. The check was deposited on this particular date, the 91st calendar day following the date of the check, because it is Bally's policy to wait at least 90 calendar days but less than 90 banking days after a check is drawn, to deposit it. This procedure appears to comply with the requirement of the New Jersey statute governing the granting of credit to gamblers by casinos. N.J.S.A. § 5:12–101. The fact that Bally's held the check for this length of time is relevant only insofar as it

is clear that when the check was deposited, Bally's had already known for some time that the check was bad, that Brinker was dead, and that his estate was insolvent. The logical inference is that Bally's knew that it was unlikely that the check would be paid by Bank Leumi, however, it decided to deposit the check and try to collect it anyway in the hope that by some chance it might be paid.[5] In fact, this gamble paid off for Bally's, as is described below.

In any event, the delay in depositing the check is otherwise irrelevant in this action. This Court does not rely on any New Jersey law or regulations which are said to permit or require this holding of the check. It need only be observed that the check was not a stale check when Bally's deposited it. See New York U.C.C. § 4–404, which establishes that a check does not become stale until it is six months old. Bally's, or any holder of a check may deposit it at any time before it becomes a stale check. Any New Jersey statutes or regulations which may provide otherwise, do not exist for the protection of a drawee-bank.

Under customary and normal banking practices and procedures, when a check is received for collection, the collecting bank will promptly encode the amount credited on the check in computer readable magnetic ink.[6] If the check were presented missing any of the other necessary encoded information, such as the account number or the bank identification number, the collecting bank would also encode this information. When the First National Bank of South Jersey received Brinker's check it encoded the amount of the check and also the bank identification number which had been handwritten on the check. The bank, however, failed to encode Brinker's account number which was also handwritten on the top of the check next to the bank identification number. This omission is unexplained.

---

5. Bally's claims that it "was certainly entitled to put the check to the test—by depositing it" because its management "might have thought" that the information received from Wohl, the estate's attorney and executor, was incorrect. (Memorandum of Law in Support of Bally's Motion for Summary Judgment, at 13). And Bally's might have thought Bank Leumi would be negligent in discovering it was a bad check, as happened.

6. Oral argument of the motion was not recorded. The Court takes judicial notice of the customary and normal banking practices and procedures. Rule 201, F.R.Evid.

Upon the arrival of the check in New York, Bank Leumi, as a part of its obligations to the collecting bank, had the duty to decide that the check be accepted and paid, or protested, and to do so by midnight of the bank's business day next following the day of receipt of the check. New York U.C.C. §§ 4–301, 4–302, 4–104(1)(h). Bank Leumi did not, however, protest the check by this deadline.

By the time the check arrived at Bank Leumi on September 9, 1980, there were no funds available to pay the check because Brinker's account had been closed for more than two months.

The normal practice at Bank Leumi and other banks is to process all incoming checks directly through a computer, without the human intervention of any employee. The computer rejects, or "spits out" those checks which it cannot process, because they are not properly or completely encoded. Brinker's check, which was missing the encoded account number, as well as a number of checks which were torn, mutilated, improperly encoded, not encoded at all, or spurious, were spit out by the computer. Such items were regularly placed in a separate basket or box by Bank Leumi employees, for future attention.

It is then the duty and practice of Bank Leumi employees to go through that basket of rejected paper, and process each of the items in the traditional and time consuming way, by hand. Bank Leumi was negligent in this regard; it failed to process the Brinker check by the protest deadline of midnight the following business day.[7] Apparently, and for unknown reasons, Bank Leumi did not protest the Brinker check

until April 8, 1981, seven months later.[8] By this time, by reason of New York U.C.C. § 4–302 it was impossible for Bank Leumi to return the check to the collecting bank in New Jersey marking it "insufficient funds" or "account closed" or relying on other traditional banking procedures. This delay was the product of negligence on the part of Bank Leumi. However, this negligence was in part caused by the negligent or intentional failure of the collecting bank, the First National Bank of South Jersey, (Bally's agent) to encode Brinker's account number as required by banking industry practice. The negligence on the part of Bank Leumi was readily and reasonably foreseeable. Bally's undoubtedly knew or should have known that most personal checks are pre-printed with computer readable identifying numbers. It was certainly foreseeable when Bally's deposited this check in non-computer readable form, known by it to be drawn on insufficient funds as of the date it was deposited, that the drawee-bank would fail to protest and · return it within the very brief time period allowed by the Code.

■ Accordingly, as we noted above, this Court must choose whether the liability for this loss is to be imposed upon the payee of a check known to be bad on the date deposited for collection on the one hand, or the negligent drawee-bank which foreseeably failed to protest the check because it was not in computer readable form, and under the pressure of business failed to meet the midnight deadline for such protest, under New York U.C.C. § 4–302. This Court believes that the loss must fall on the payee, rather than on the drawee-bank. To hold

---

**7.** It is not clear when Bank Leumi actually discovered that there were no funds with which to pay the Brinker check, or that the check had *already been paid by mistake. Bank Leumi* only states that, "due to error, the draft was paid and the mistake was not immediately discovered." Bank Leumi claims that the cause of the delay was that:

> "During the time in question, Bank Leumi was experiencing more than a doubling in volume of its daily transactions as a result of its purchase in July of 1980 of thirteen branches formerly operated by Bankers Trust

Co. This multiple branch acquisition was an extraordinary expansion of the number of branches operated by Bank Leumi and se-*verely taxed the bank's transaction process-ing resources."* (D'Amato Affidavit, at 4).

**8.** Insofar as this action is concerned, it is irrelevant when Bank Leumi discovered the mistake or its cause since the midnight deadline had passed, so as to preclude protesting the check and sending it back to the Collecting Bank. As between these parties, this action was timely commenced.

otherwise would permit the maker or payee of a check simply by providing a non-computer readable form check, to set a trap for an unwary bank.

■ New York law is clear as between the parties, that "[a] bank paying out money on a check or note by mistake may recover back the payment from the person to whom it was made, even though the bank was negligent in making the mistake, so long as the payee does not suffer as a result of the mistake." 42 *N.Y.Jur.*, Negotiable Instruments § 585. See *National Bank of Commerce in New York v. National Mechanics Banking Assoc. of New York*, 55 N.Y. 211, 213 (1873); *Valley Bank of Nevada v. Bank of Commerce*, 74 Misc.2d 195, 343 N.Y.S.2d 191, 195 (Civ.Ct.N.Y.Co. 1973). A bank may recover funds paid on a check by mistake, when as here the customer's account with the bank had been closed as of the date the check was presented for payment. *Manufacturers Trust Co. v. Diamond*, 17 Misc.2d 909, 186 N.Y.S.2d 917 (App. Term 1st Dept. 1959). "There is no reason why a bank, merely because it is a bank, should be denied recovery of money paid by mistake in circumstances which would justify recovery by anyone else. Banks have been held entitled to relief in such situations." *Id.* at 910, 186 N.Y.S.2d 917.

By its terms, the Uniform Commercial Code, as adopted by New York, does not alter this result. "Unless displaced by the particular provisions of this Act, the principles of law and equity, including ... the law relative to ... mistake ... shall supplement its provisions." New York U.C.C. § 1–103.

According to the New York Court of Appeals, "[u]nder the plain import of this section, nothing short of an express code provision limiting plaintiff's remedy ... would suffice ...." *Hechter v. New York Life Insurance Co.*, 46 N.Y.2d 34, 39, 412 N.Y. S.2d 812, 385 N.E.2d 551 (1978). The commentators agree that the U.C.C. expressly preserves the common law governing mistake without alteration. Anderson, *Uniform Commercial Code* § 1–103:42. See

New York U.C.C. § 4–407, Official Comment 5.

Bally's reliance on New York U.C.C. §§ 3–418, 4–301 and 4–302 is misplaced. These sections of the U.C.C. apply to interbank settlement procedures, and not to subsequent actions for restitution. A contrary reading of §§ 3–418, 4–301 and 4–302 would be inconsistent with § 1–103 which retains the common law governing mistake. It would lead to the unintended result of allowing a payee, unjustly, to retain monies improperly obtained.

■ Furthermore, although the death of the maker of a check or note does not terminate his liability, it does revoke the authority of the payee to collect from the drawee-bank and relegates the payee to the status of a general creditor of the estate of the deceased. *In re Kolben's Estate*, 203 Misc. 1012, 1014, 120 N.Y.S.2d 812 (N.Y.Sur. Ct.1953); *In re Greene's Estate*, 47 Misc.2d 140, 143, 261 N.Y.S.2d 977 (N.Y.Sur.Ct. 1965). The U.C.C. provides a similar result. New York U.C.C. § 4–405(1). "Under 4–405(1) a bank's authority to handle items on its customer's account terminates when the bank learns that he has died ...." White & Summers, *Uniform Commercial Code* at 665 (2d ed. 1980). Bally's, therefore, had no right to collect the check from Bank Leumi once it knew Brinker had died. On this additional ground, Bank Leumi may recover for its mistaken payment.

Bally's implies that it relied on Bank Leumi's payment of the Brinker check, and thereby forfeited its right to proceed as a creditor against Brinker's estate. (Bally's Reply Memorandum of Law, at 3). First, Bally's could not recover against Brinker's estate if, as appears, the estate was and is clearly insufficient and probably insolvent. Nor has Bally's lost its right to proceed against Brinker's estate. See New York C.P.L.R. §§ 210, 213.

Bally's submitted the Brinker check for collection knowing that the check was not on pre-printed computer readable Bank Leumi form of check, and it was therefore likely to be subject to delays in payment.

Bally's also had been reliably informed that Brinker was dead and his estate was insufficient. It was therefore likely that there were insufficient funds in Brinker's Bank Leumi account, if the account still existed, from which to pay the check. Bally's also knew or should have known that it was very possible, if not likely, that the check would be paid by mistake. Bally's has not suffered through this mistake. It has lost no rights which it would have had if Bank Leumi had not paid the check by mistake, nor has it suffered any other loss because of any action of Bank Leumi.

In light of all of the above, this Court finds that the burden of pursuing the estate of the maker should fall on the depositor of a check known to be worthless, rather than on the drawee-bank guilty of computer induced negligence in failing to protest the check in timely fashion.

The Clerk shall enter final judgment in favor of plaintiff Bank Leumi in the sum of $60,000.00, plus pre-judgment interest at 6% per annum from April 8, 1981; costs to be taxed.

So Ordered.