In re SPRING GROVE LIVESTOCK
EXCHANGE, INC., Debtor.

Charles W. RIES, Trustee for the Estate
of Spring Grove Livestock Exchange,
Inc., Plaintiff,

v.

FIRSTAR BANK MILWAUKEE, N.A.,
and Firstar Bank Wausau, N.A.,
Defendants.

In re John D. MORKEN and Dorothy
M. Morken, Debtors.

Phillip L. KUNKEL, Trustee for the
Estate of John D. Morken and
Dorothy M. Morken, Plaintiff,

v.

FIRSTAR BANK MILWAUKEE, N.A.,
and Firstar Bank Wausau, N.A.,
Defendants.

Bankruptcy Nos. 4–94–3025, 4–94–2954.
Adv. Nos. 4–95–249, 4–95–181.

United States Bankruptcy Court,
D. Minnesota.

Feb. 10, 1997.

152

Jerome A. Miranowski, Oppenheimer, Wolff & Donnelly, Minneapolis, MN, Renee C. Rubish, Charles W. Ries, Farrish, Johnson & Maschka, Mankato, MN, for plaintiffs.

Clark T. Whitmore, Maslon, Edelman, Borman & Brand, Minneapolis, MN, Thomas L. Shriner, Jr., Foley & Lardner, Milwaukee, WI, for defendants.

### ORDER FOR JUDGMENT

ROBERT J. KRESSEL, Bankruptcy Judge.

These adversary proceedings came on for hearing on the parties' cross-motions for summary judgment. Jerome Miranowski appeared on behalf of Phillip Kunkel. Renee Rubish appeared on behalf of Charles Ries. Charles Ries appeared *in propria persona*. Clark Whitmore and Thomas Shriner appeared for the defendants.

This court has jurisdiction pursuant to 11 U.S.C. §§ 157(a) and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157 b(2)(A), (B), (C), (F), (H), and (O).

### Background

This is Act IV in a drama of indeterminate length.[1] The parties suggest a theatrical assemblage: On one side are the trustees, who seek to recover millions of dollars for their insolvent estates. On the other side are the defendants, who, having already been duped out of twenty-one million dollars, seek to prevent further losses. Off-stage are the debtors, two of whom, in the midst of this drama, perpetrated a check kiting scheme of epic proportions.[2] The facts are as follows:

John Morken was a Minnesota cattle broker who conducted his livestock business through his wholly-owned corporation, Spring Grove Livestock Exchange, Inc. Phillip Kunkel is the trustee in the Morkens' case. Charles Ries is the trustee in the SGLE case. Firstar Bank Milwaukee, N.A. and Firstar Bank Wausau, N.A. are national banks located in Wisconsin.

In the period preceding his association with the defendants, Morken conducted his financial affairs through Sprague National Bank, a bank located in Caledonia, Minnesota. As Morken's business grew, so did his need for cash management. In 1992, Morken informed Firstar Milwaukee employee, Mark Miley, that he was experiencing negative cash flows. Miley suggested that Morken employ a form of cash management known as control disbursement.

Control disbursement is a standard cash management tool designed to minimize both the frequency and amount of account transfers. Control disbursement requires two separate, but interdependent "companion" accounts: a funding account, into which deposits are made, and a disbursement account, against which checks are drawn. Control disbursement enables customers to transfer funds only as needed. Using electronic clearings information, customers know exactly which checks will clear the disbursement account on any given day.

Since Sprague could not provide control disbursement services, Morken transferred his accounts to Firstar Milwaukee. In January 1992, Morken opened, on behalf of SGLE, a funding account at Firstar Milwaukee and a disbursement account at Firstar Wausau. In June of the same year, Morken also opened a business checking account at Firstar Milwaukee. In conjunction with his control disbursement accounts, Morken executed a Wholesale Lockbox agreement. Under the agreement, cattle purchasers sent payments directly to a lockbox located at Firstar Milwaukee, where employees en-

---

1. Acts I, II and III can be found at *Monfort, Inc., v. Kunkel (In re Morken)*, 182 B.R. 1007 (Bankr. D.Minn.1995), *Kunkel v. Sprague Nat'l Bank*, 198 B.R. 734 (D.Minn.1996) and *Kunkel v. Ries (In re Morken)*, 199 B.R. 940 (Bankr.D.Minn.1996).

2. On September 18, 1996, John Morken plead guilty to bank fraud.

dorsed and deposited the checks into the funding account.

In order to alleviate the cash deficits which had precipitated Morken's need for control disbursement, Firstar Milwaukee provided "instant credit" on Morken and SGLE's uncollected deposits. When deposits were made into the Morken and funding accounts, Firstar Milwaukee provisionally credited the accounts in matching amounts.

In the period from June 1992 to May 1994, the average negative collected funds balance in the Morken and SGLE accounts increased precipitously.[3] Although these numbers generated some concern, Firstar Milwaukee continued to provisionally advance funds to Morken and SGLE on uncollected deposits.

On June 2, 1994, Firstar Milwaukee employees discovered evidence of a possible check kite. A preliminary investigation confirmed that Morken was kiting among the Morken account and the SGLE accounts. In an effort to terminate the kite and to cut its losses, Firstar Milwaukee began reversing provisional credits and returning checks unpaid. These transactions, which are the subject of the parties' cross-motions for summary judgment, can be roughly summarized as follows:[4]

On June 3, Firstar Milwaukee transferred $91,323,220.04 from the disbursement account to the funding account.

On June 3, Firstar Milwaukee reversed $73,169,813.25 in credits advanced to the Morken account.

On June 6, Firstar Milwaukee transferred $2,896,754.01 from the funding account to the Morken account.

On June 6, Firstar Milwaukee transferred $244,445.44 from the funding account to the Morken account.

On June 6, Firstar Milwaukee received a check made payable to SGLE in the amount of $89,860.36. Firstar Milwaukee endorsed the check on behalf of SGLE, but deposited the proceeds into the Morken account.

On June 7, Firstar Milwaukee received two checks made payable to SGLE in the amount of $364,436.60. Firstar Milwaukee endorsed the checks on SGLE's behalf, but deposited the proceeds into the Morken account.

On June 9, Firstar Milwaukee received $133,808.65 made payable to SGLE. Firstar Milwaukee deposited this amount into a suspense account.

On June 10, 1994, the Morkens and SGLE filed bankruptcy. While the Morkens originally filed under Chapter 11, their case was converted to a case under Chapter 7.

On June 2, 1995, Phillip Kunkel filed his complaint against the defendants and on August 25, 1995, Charles Ries filed his.

Ries and the defendants move for summary judgment on all counts. Kunkel moves for summary judgment on Count IV of his Second Amended Complaint.

### Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure governs summary judgment. Under the rule, summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).[5]

In order to obtain summary judgment, the moving party must demonstrate that there is no genuine issue of material fact. The substantive law determines which facts are material. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit ... will properly preclude the entry of

---

3. From June 1992 to May 1994, the average uncollected funds balance in the Morken account increased from $15,851 to $21,746,839. Over the same period, the average uncollected funds balance in the funding account increased from $1,776,289 to $5,158,235.

4. In their briefs, the parties provided a copious recounting of the debits and credits which posted to the three accounts in the ensuing period. I am loathe both to recreate this numerological nightmare or to impose it on the reader.

5. Rule 56 applies in adversary proceedings by reference to Fed.R.Bankr.P. 7056.

summary judgment." *Id.* Furthermore, the dispute must be genuine, "such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Rule 56(c) places the initial burden of production on the moving party to show the absence of a genuine issue of material fact:

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

Once the movant has made this initial showing, the burden shifts to the nonmoving party to demonstrate the existence of a genuine issue of material fact. The nonmoving party may not discharge its burden simply by resting on its pleadings. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."). In fact, Rule 56(e) expressly requires the nonmoving party to present "specific facts" which demonstrate the need for a trial. All inferences must be construed in the light most favorable to the nonmoving party. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

When deciding a motion for summary judgment, the judge cannot resolve factual disputes or weigh evidence. "[A]t the summary judgment stage the judge's function is not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2511.[6] However, if the evidence is so one-sided that

no reasonable fact-finder could rule in favor of the nonmoving party, summary judgment necessarily follows.

## Preferential Transfers

### *Provisional Credits*

■ In Count I of his Amended Complaint, Ries argues that Firstar Milwaukee's reversal of $91,000,000 of provisional credits posted to the disbursement account constitutes a preferential transfer. Likewise, in Count I of his Second Amended Complaint, Kunkel seeks to recover $73,000,000 from Firstar Milwaukee as a preferential transfer.[7]

Section 547 of the Bankruptcy Code allows the trustee to avoid any transfer of an interest of the debtor in property:

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made

(A) on or within 90 days before the date of the filing of the petition ... and

(5) that enables such creditor to receive more than such creditor would receive if

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547.

A trustee must establish all five statutory elements to prevail on a preference claim. "[T]he trustee has the burden of proving the avoidability of a transfer under subsection (b) of this section...." § 547(g).

In their respective complaints, Kunkel and Ries contend that Firstar Milwaukee's extension of provisional credits against Mork-

---

6. At the summary judgment stage, the judge is not required to make findings of fact, although findings may be "extremely helpful to a reviewing court." *Anderson,* 477 U.S. at 250 n. 6, 106 S.Ct. at 2511 n. 6.

7. Between May 31 and June 2, Morken deposited $73,169,813.25 into his account in checks drawn on the disbursement account. Firstar Milwaukee provisionally credited the Morken account in this amount. After discovering the kite, however, it reversed the provisional credits and returned the checks unpaid.

en and SGLE's uncollected deposits created antecedent debts. However, the Eighth Circuit's recent decision in *Laws v. United Missouri Bank*, 98 F.3d 1047 (8th Cir.1996) effectively forecloses this argument.

As in the instant case, *Laws* details one debtor's manipulation of the mechanics of cash management to perpetrate a check kiting scheme. In *Laws*, Kroh, a large real estate developer, commenced a banking relationship with United Missouri Bank. Kroh regularly made deposits into its checking account, which UMB credited in matching amounts, providing Kroh with immediate access to the uncollected funds. Over the course of its banking relationship with UMB, Kroh's average negative collected funds balance increased. When UMB informed Kroh that it would no longer advance funds on uncollected deposits, Kroh borrowed four million dollars from another institution and wired the funds to its UMB account. Kroh subsequently filed bankruptcy and the trustee commenced proceedings to recover the four million dollars as a preferential transfer.

The district court held that UMB's advances on Kroh's uncollected deposits created antecedent debts under § 547(b)(2). However, the court granted summary judgment in favor of UMB, finding that the transfer did not improve the bank's position.

On appeal, the Eighth Circuit identified three discrete times when a debt may be incurred for § 547 purposes: "[W]hen the bank provisionally credits the customer's account for a deposited check, when the customer uses that provisional credit by drawing down the account, or when the deposited check is in fact dishonored." *Id.* at 1050.

The court rejected the trustee's contention that the mere *posting* of provisional credits created an antecedent debt. Instead, the court likened advances on uncollected funds to a line of credit which the customer could draw on at will. "A provisional credit, like a line of credit, is no more than the *opportunity* to obtain funds." *Id.* (emphasis added).

Acknowledging the "tangible value" of advances on uncollected deposits, the Eighth Circuit noted that a property interest in provisional credits arises once the customer draws on the advances. However, the court distinguished between the creation of a property interest and the incurring of a debt. "[T]o say that advances drawn by the depositor are his property does not necessarily mean that the depositor thereby incurs a debt." *Id.*

Conceding the complexity of the issues, the court nevertheless concluded that "routine advances against uncollected deposits do not create a "debt" to the bank." *Id.* at 1051.[8] In light of *Laws*, I find that Firstar Milwaukee's extension of provisional credit to the Morken and SGLE accounts did not create an antecedent debt. Therefore, the reversal of these credits cannot constitute a transfer on account of an antecedent debt. Since the trustees have failed to establish the existence of an antecedent debt—an element on which they bear the burden of proof—summary judgment necessarily follows:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

---

8. The Eighth Circuit intimated that advances against uncollected deposits might give rise to a debt if the advances were infrequent and the parties treated the provisional credits as loans. "Had Kroh and UMB explicitly agreed to convert future negative collected funds balances into loans, Kroh would have been legally bound to pay such debts as incurred." *Laws*, 98 F.3d at 1052. In the instant case, Firstar Milwaukee routinely extended provisional credits to Morken and SGLE for nearly two years. In fact, Morken's principle reason for employing cash management was to obtain immediate access to deposits which were not otherwise immediately collectible. Therefore, while the relationship between the parties had some indicia of a lending relationship, Firstar Milwaukee never thought of its advances as loans or treated them as such.

*Other Preference Claims*

In Count I of his Second Amended Complaint, Kunkel also raises three additional preference claims. Kunkel seeks recovery from Firstar Milwaukee in the amounts of $482,561.42, $176,000 and $105,000.

■ Kunkel seeks to recover $482.561.42 in deposits made to the funding account and transferred by Firstar Milwaukee to the Morken account. Kunkel's claim fails for several reasons. First, Kunkel's claim appears to be duplicative, or at least derivative, of Ries' 2.9 million dollar claim (*see infra*).[9] Furthermore, the source of the funds is unclear. Although Kunkel contends that the funds are proceeds from third-party deposits, the record suggests that the funds may be provisional credits. Insofar as the funds represent advances against uncollected deposits, *Laws* is controlling. Finally, Kunkel seeks relief to which he is not entitled. As trustee for the *Morken* estate, Kunkel lacks standing to recover transfers from *SGLE's* funding account.

■ Kunkel also seeks recovery of $176,803.86 in analysis fees assessed against the Morken account in April and May of 1994. However, Kunkel's preference claim fails since the transfer did not enable Firstar Milwaukee to receive more than it would have in a Chapter 7 liquidation. Firstar Milwaukee's transfer amounted to nothing more than an accounting transaction which shifted Morken's debt from one ledger to another, but did not reduce it.

Kunkel also argues that Firstar Milwaukee's transfer of $105,000 from the Morken account to cover overdraft loans constitutes a preferential transfer. Like the claim for analysis fees, Firstar Milwaukee did not receive more than it would have in a Chapter 7 liquidation. The bank simply moved the debtor's debt from one category to another, but did not reduce it.

Since both Kunkel and Ries have failed to establish the elements of a preference claim, I will deny their motions for summary judgment on Count I of their respective complaints and grant summary judgment to the defendants.

## Violations of the Debtor–Creditor Relationship

■ In Count II, III, V and VII of his Amended Complaint, Ries contends that Firstar Wausau violated its debtor-creditor relationship with SGLE by reversing $91,000,000 in provisional credits posted to the disbursement account. Ries mischaracterizes the SGLE–Firstar Wausau relationship.

■ Normally, a debtor-creditor relationship is created when a customer deposits funds into a bank account. "A person with an account at a bank enjoys a claim against the bank ... in an amount equal to the account balance." *Barnhill v. Johnson*, 503 U.S. 393, 398, 112 S.Ct. 1386, 1389, 118 L.Ed.2d 39 (1992). However, this configuration between bank and customer is nominal only. Clearly, the bank's liability is premised on the presence of *collectible* funds. In the absence of good funds, a debtor-creditor relationship never arises.

In the instant case, Firstar Wausau never incurred a debt to SGLE since SGLE's deposits were uncollectible. When Firstar Milwaukee discovered the kite, Firstar Wausau's status as a putative debtor ceased, and it became entitled to take all lawful actions necessary to minimize its losses—including the reversal of provisional postings.

Since I conclude that a debtor-creditor relationship never arose between Firstar Wausau and SGLE, I will deny Ries' motion and grant the defendants summary judgment on the breach of debtor-creditor relationship claims in Count II, III, V and VII of Ries' Amended Complaint.

## Breach of Contract

Ries also raises a number of issues which I collectively construe as breach of contract claims. In Count II of his Amended Complaint, Ries contends that Firstar Milwau-

---

9. In his Second Amended Complaint, Kunkel originally sought to recover $2,900,000 in transfers from the funding account. Kunkel now contends that only $482,561.42 of this amount belongs to Morken. In his Amended Complaint, Ries seeks to recover—albeit on different grounds—the entire 2.9 million dollar transfer. Clearly, both trustees cannot recover on the same claim. The resolution of this issue is best reserved for the claims objection stage.

kee's $91,000,000 reversal of provisional credits violated the Agency Agreement, Control Disbursement Agreement and Funds Transfer Agreement.

### The Agency Agreement

■ The Agency Agreement governs the banking relationship between Firstar Milwaukee and Firstar Wausau. Specifically, the Agency Agreement authorizes Firstar Milwaukee to process checks presented against the disbursement account on behalf of Firstar Wausau: "With respect to the Control Disbursement Accounts and Items drawn thereon ... [Firstar Milwaukee] is hereby authorized to be the sole agent of [Firstar Wausau]...." Agency Agreement ¶ 1.

Ries contends that the Agency Agreement rendered transfers from the funding account to the disbursement account irrevocable. However, the Agency Agreement expressly contemplates the *provisional* nature of transfers and provides for a period of revocation in compliance with the midnight deadline: "Firstar Wausau acknowledges that all transfers of funds from the [Funding Account] to the ... Disbursement Account ... *are provisional credit* [s] *only,* which ... may be revoked by [Firstar Milwaukee] in its sole discretion at any time prior to the [Midnight Deadline]." *Id.* ¶ 2 (emphasis added).

Furthermore, the Agency Agreement specifically authorizes the return of items that would create overdrafts in the funding account. *Id.* ¶ 1(d). Pursuant to these provisions, Firstar Milwaukee reversed the provisional credits and returned the checks unpaid only after discovering that the deposits to the funding account were uncollectible. Therefore, I find that Firstar Milwaukee acted in compliance with the Agency Agreement.[10]

### The Control Disbursement Agreement

Ries also alleges that Firstar Milwaukee's revocation of provisional credits violated the Control Disbursement Agreement. Like the Agency Agreement, the Control Disbursement Agreement contemplates the provisional nature of advances on uncollected deposits: "[Firstar Milwaukee] is authorized to transfer funds by provisional credit to [Firstar Wausau] from the [funding account] ... in an amount equal to the total of all amounts payable on all Items which are presented ... for collection or payment." Agency Agreement ¶ 2(A).

In the event that the provisional advances are inadequate to cover items presented against the disbursement account, the Agency Agreement allows the advancing bank to either revoke the provisional credits or advance *additional* funds to cover the disbursements:

> If the collected funds on deposit at Funding Bank are insufficient for such purpose, [Firstar Milwaukee] may in its sole discretion revoke the provisional credit ... and return the Items which created such provisional credit unpaid, or [Firstar Milwaukee] may in its sole discretion provisionally advance the necessary additional funds to Customer and transfer such provisional credit in the amount thereof to [the disbursement account]....

*Id.*

In the instant case, Firstar Milwaukee provisionally advanced funds to cover the items presented for payment against the disbursement account. However, when Firstar Milwaukee discovered the check kite, it exercised its contractual authority to revoke the provisional advances and return the checks unpaid. Firstar Milwaukee did not choose to advance additional funds. Therefore, I find that Firstar Milwaukee acted in compliance with the Control Disbursement Agreement.

### The Funds Transfer Agreement

■ Finally, Ries alleges that Firstar Milwaukee violated the Funds Transfer Agree-

---

**10.** The Agency Agreement also authorizes the return of items which are not properly payable: "Prior to the Final Payment Deadline, [Firstar Milwaukee may] return unpaid any Item[s] if such Item[s] are not properly payable ... according to the provisions of the Uniform Commercial Code as adopted by the State of Wisconsin." Agency Agreement ¶ 1(e). Since the items presented against the disbursement account were not properly payable (*see infra* my discussion of wrongful dishonor), Firstar Milwaukee acted in compliance with the Agency Agreement by returning the checks unpaid.

ment by reversing $91,000,000 in provisional credits posted to the disbursement account. In particular, Ries points to a provision which deems all funds transfers "final and ... not ... subject to stop payment or recall orders." Funds Transfer Agreement ¶ 3.1. However, I find that the Funds Transfer Agreement has no applicability to the transfers at issue.

On its face, the Funds Transfer Agreement governs *wire transfers* from the funding account to outside bank accounts—not posting transactions between control disbursement accounts. Notably, the Funds Transfer Agreement makes no reference to Control Disbursement. In fact, SGLE executed the Funds Transfer Agreement on March 17, 1992, more than a month after commencing control disbursement services.

Furthermore, the two agreements clearly contemplate different methods of transfer. For example, the Funds Transfer Agreement provides for transfers pursuant to SGLE authorization: "[Firstar Milwaukee] is authorized from time to time to transfer funds ... when requested to do so by Authorized representatives of [SGLE] or any persons purporting to be such...." *Id.* ¶ 2.1. By contrast, transfers from the funding account to the disbursement account occurred automatically, without SGLE intervention.

Since I find, collectively, that the Agency Agreement, Control Disbursement Agreement and Funds Transfer Agreement do not govern the transfers at issue, I will grant summary judgment to the defendants and deny summary judgment to Ries on the breach of contract claims in Count II of his Amended Complaint.

### Conversion, Misappropriation and/or Theft

In Counts III, V and VII of his Amended Complaint, Ries alternatively alleges that Firstar Milwaukee committed "conversion, misappropriation and/or theft" when it deposited checks payable to SGLE into the Morken account. Ries asserts both statutory and common-law claims of conversion as a basis for recovery.

Even if Firstar Milwaukee misappropriated SGLE's funds by depositing them into the Morken account, Ries still cannot recover the value of the converted checks. The defendants have outstanding claims of over $21,000,000. Even if the checks were improperly credited, they would only go to reduce the defendants' claim. There is nothing for Ries to recover. At best, Ries can direct that the checks be deposited into the funding account, thereby reducing SGLE's outstanding debt to Firstar Milwaukee. Since Ries seeks relief to which he is not entitled, I will deny summary judgment on Counts III, V and VII of his Amended Complaint and grant summary judgment to the defendants.[11]

### State Law Claims

In addition, the trustees assert a miscellany of state law claims:

### U.C.C. Article 4

In Count XI of Ries' Amended Complaint and Counts II, III and IV of Kunkel's Second Amended Complaint, the trustees raise a number of Article 4 claims.[12] Specifically, the trustees allege that the defendants missed Article 4's "midnight deadline" by returning the kited checks in an untimely manner. "'Midnight deadline' with respect to a bank is midnight on its next banking day following the banking day on which it receives the relevant item or notice or from which the time for taking action commences to run, whichever is later." U.C.C. § 4–104(a)(10).

A bank which fails to return checks by the midnight deadline may incur liability under the U.C.C.'s "accountability" statute. U.C.C. § 4–302(a) imposes liability on banks for the amount of:

(1) a demand item, other than a documentary draft, whether properly payable or not, if the bank, in any case in which it is

---

11. It is premature to seek adjustments in the respective deficits of the bankrupt estates at this time. If Ries wants to contest Firstar Milwaukee's proof of claim in the SGLE estate, he can surely do so by objecting to its claim.

12. Article 4 of the Uniform Commercial Code governs check collection procedures in the State of Wisconsin. *Northwestern Nat'l Insur. Co. v. Midland Nat'l Bank,* 96 Wis.2d 155, 292 N.W.2d 591, 595 (1980).

not also the depository bank, retains the item beyond midnight of the banking day of receipt without settling for it or, whether or not it is also the depository bank, does not pay or return the item or send notice of dishonor until after its midnight deadline; or

(2) any other properly payable item unless, within the time allowed for acceptance or payment of that item, the bank either accepts or pays the item or returns it and accompanying documents.

U.C.C. § 4–302(a).

At the same time, a bank's accountability is not absolute. In 1990, the drafters of the Uniform Commercial Code amended Section 4–302 to expressly provide for a fraud defense: "The liability of a payor bank [for failure to comply with the midnight deadline] is subject to ... proof that the person seeking enforcement of the liability presented or transferred the item for the purpose of defrauding the payor bank." U.C.C. § 4–302(b).

Under revised § 4–302, Morken and SGLE's check kiting would surely be a defense to the trustees' accountability claims.[13] However, the Wisconsin legislature did not adopt revised § 4–302 until 1995, shortly after the transfers at issue took place.[14] Therefore, we must look to the provision in effect at the time of transfer to determine if the defendants are accountable for missing the midnight deadline.

In 1994, Wisconsin followed former § 4–302, which provided banks with only limited defenses, including "breach of presentment warranty ... settlement effected or the like."

Wis.Stat. § 404.302. Most courts interpret former § 4–302 as imposing strict liability on banks which miss the midnight deadline.[15] *See First Nat'l Bank v. Colonial Bank*, 898 F.Supp. 1220, 1226 (N.D.Ill.1995) ("Courts interpreting [§ 4–302] have nearly unanimously concluded that s 4–302 imposes strict liability on a payor bank for failing to adhere to the midnight deadline...."); *Chicago Title Ins. Co. v. California Canadian Bank*, 1 Cal.App.4th 798, 2 Cal.Rptr.2d 422, 426 (1992) ("[S]ection 4–302 creates a liability independent of negligence...."); *Morgan Guar. Trust Co. v. American Sav. & Loan Assoc.*, 804 F.2d 1487, 1499 (9th Cir.1986) ("Courts have universally held that payor banks are strictly liable for violation of 4–302 deadlines.").

Nevertheless, several courts interpreting pre-revision § 4–302 have refused to enforce the midnight deadline in cases involving fraud. For example, in *Bank Leumi Trust Co. v. Bally's Park Place, Inc.*, 528 F.Supp. 349 (S.D.N.Y.1981), the defendant deposited a check despite its knowledge that the maker of the instrument was deceased and his estate insolvent. The drawee, Bank Leumi, failed to return the check within the midnight deadline. Notwithstanding the bank's negligence, the court concluded that the payee's knowledge prevented enforcement of the midnight deadline. "[T]his court finds that the burden ... should fall on the depositor of a check known to be worthless, rather than on the drawee-bank guilty of ... negligence in failing to protest the check in timely fashion." *Id.* at 355.

Likewise, in *American Nat'l Bank v. Foodbasket*, 497 P.2d 546 (Wyo.1972), the court

---

13. "It is well settled that a trustee in bankruptcy stands in the shoes of the debtor...." *Stumpf v. Albracht*, 982 F.2d 275, 277 (8th Cir.1992).

14. The bank's liability is governed by the law of the state in which the bank is located: "The liability of a bank for action or non-action with respect to an item handled by it for purposes of presentment, payment, or collection is governed by the law of the place where the bank is located." U.C.C. § 4–102(b).

15. The majority of midnight deadline cases involve suits by banks against banks. *See National State Bank v. Federal Reserve Bank*, 979 F.2d 1579 (3d Cir.1992); *Farmers & Merchants State*

*Bank v. Western Bank*, 841 F.2d 1433 (9th Cir. 1987); *Union Bank v. First Nat'l Bank*, 677 F.2d 1074 (5th Cir.1982). As between such similarly situated parties, courts have been willing to allocate loss to the institution best able to bear it— usually the payor bank. *See Hanna v. First Nat'l Bank*, 87 N.Y.2d 107, 637 N.Y.S.2d 953, 959–60, 661 N.E.2d 683, 689–90 (1995) ("Liability ultimately rests upon the payor bank because it was the institution in the best position to timely dishonor or return the item in the first place."). However, no court has allowed a check kiter, in his individual capacity, to enforce the midnight deadline against a defrauded bank. This is precisely what the trustees ask the court to do.

refused to enforce the midnight deadline when the drawer knew there were insufficient funds to cover the check. "At most the record reflects that [the drawer] hoped she could somehow obtain funds to cover the checks, but nothing was presented as a basis for her having reason to expect that the checks would be paid." *Id.* at 547.

Finally, in *United States Fidelity & Guar. Co. v. Federal Reserve Bank*, 620 F.Supp. 361 (S.D.N.Y.1985), the court refused to enforce the midnight deadline against a collecting bank when the depository bank was aware that the drawer of the check did not have an account with the collecting bank. "It has been repeatedly recognized ... that § 4–302 does not shift the burden of loss to a payor bank which misses its deadline if the payee was already aware when presenting the check that it would not be accepted or paid except by mistake." *Id.* at 373.

Since no Wisconsin court has yet addressed the issue, I am called upon to determine whether former § 4–302's "or the like" language encompasses a fraud defense. Statutory construction is a question of law. *United States v. Hensley*, 36 F.3d 39, 41 (8th Cir.1994); *Jungbluth v. Hometown, Inc.*, 192 Wis.2d 450, 531 N.W.2d 412, 414 (Ct.App. 1995). When construing statutes, courts are constrained to give effect to the intent of the legislature. *United States v. Cooper Corp.*, 312 U.S. 600, 61 S.Ct. 742, 85 L.Ed. 1071 (1941). Construction is unnecessary if the statutory language is plain on its face. *Helvering v. New York Trust Co.*, 292 U.S. 455, 54 S.Ct. 806, 78 L.Ed. 1361 (1934). If a statute is ambiguous, however, courts may look to legislative history.

■ In the instant case, § 4–302's open-ended "or the like" language invites multiple interpretations. Since the statute is ambiguous, the trustees ask this court to apply the rule of *ejusdem generis*. Under the doctrine of *ejusdem generis*, general words in a statute take their meaning from preceding designations. Therefore, I must determine whether check kiting is sufficiently similar to *breach of warranty* and *settlement effected* to constitute a "like" defense.

Section 3–417 of the U.C.C. defines *presentment warranty*. Under the section, the presenter of an instrument warrants, among other things, that he is the person entitled to payment and that the check has not been altered. U.C.C. § 3–417. A person who breaches the presentment warranty, like a person who kites checks between bank accounts, practices a type of fraud. Therefore, I conclude that check kiting is sufficiently similar to breach of presentment warranty to constitute a like defense under § 4–302.

■ I am guided in my result by reference to Revised § 4–302. "[T]here are no principles of construction which prevent the utilization by the courts of subsequent enactments or amendments as an aid in arriving at the correct meaning of a prior statute...." 73 Am.Jur.2d *Statutes* § 178 (1974); *see Great Northern Ry. Co. v. United States*, 315 U.S. 262, 277, 62 S.Ct. 529, 535, 86 L.Ed. 836 (1942) ("It is settled that 'subsequent legislation may be considered to assist in the interpretation of prior legislation upon the same subject.'") (quoting *Tiger v. Western Inv. Co.*, 221 U.S. 286, 309, 31 S.Ct. 578, 584, 55 L.Ed. 738 (1911)).

As previously mentioned, revised § 4–302 eliminates the ambiguity inherent in the former provision by specifically providing for a fraud defense. "Subsection (b) drops the ambiguous 'or the like' language and provides that the payor bank may also raise the defense of fraud." Revised U.C.C. § 4–302, cmt. 3.

Furthermore, the revisers endorse a line of cases, including *Bank of Leumi* and *Foodbasket*, which allowed banks to raise the defense of fraud. "In *Bank of Leumi Trust Co. v. Bally's Park Place Inc.*, 528 F.Supp. 349 (S.D.N.Y.1981), and *American National Bank v. Foodbasket*, 497 P.2d 546 (Wyo. 1972), banks that were accountable under Section 4–302 for missing their midnight deadline were successful in defending against parties who initiated collection knowing that the check would not be paid." *Id.* Significantly, the drafters single out check kiting as the type of fraud which bars enforcement of the midnight deadline: "A payor bank that makes a late return of an item should not be

liable to a defrauder operating a check kiting scheme." *Id.*[16]

I will grant summary judgment in favor of Firstar Wausau and Firstar Milwaukee on Counts II, III and IV of Kunkel's Second Amended Complaint and Count XI of Ries' Amended Complaint. Since I have concluded that Morken and SGLE's fraud bars enforcement of the midnight deadline, it is unnecessary to decide whether or not the defendants returned the kited checks in an untimely manner.

### Fraudulent Transfers

■ In Counts IV, VI and VIII of his Amended Complaint, Ries attacks three transfers from SGLE's funding account to the Morken account as fraudulent transfers under § 548 of the Code. The transferred funds consist both of provisional credits issued by Firstar Milwaukee and proceeds from third party checks payable to SGLE.

■ To recover under § 548, the trustee must first show a "transfer of an interest of the debtor *in property.*" 11 U.S.C. § 548(a) (emphasis added). In *Laws v. United Missouri Bank,* 98 F.3d 1047 (8th Cir.1996), the Eighth Circuit concluded that a property interest in provisional credits does not arise until the customer *draws* on the funds. "Certainly the depositor receives tangible value when permitted to draw against uncollected deposits. At this point ... 'the provisional credit [has] ripened into an interest in property of the Debtor.'" *Id.* at 1050 (quoting *In re Smith,* 966 F.2d 1527, 1535 (7th Cir.1992)). SGLE had not drawn on the provisional credits by the time Firstar Milwaukee transferred the funds to the Morken account.

Ries also alleges that Firstar Milwaukee's transfer of collected funds constitutes a fraudulent transfer. However, courts have concluded that customers do not enjoy property interests even in "good funds." For example, in *Citizens Bank v. Strumpf,* —— U.S. at ——, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995), the Court rejected the debtor's contention that a positive balance in a checking account created a property interest. "That view ... might be arguable if a bank account consisted of money belonging to the depositor and held by the bank. In fact, however, it consists of nothing more or less than a promise to pay, from the bank to the depositor...." *Id.* at ——, 116 S.Ct. at 290.

Following *Laws* and *Strumpf,* I conclude that SGLE did not have a property interest in the uncollected funds balance in its funding account or in the proceeds from third party deposits. As a result, there was no transfer of SGLE's interest in property. Accordingly, I will deny Ries summary judgment and grant the defendants' motion on Counts IV, VI and VIII of Ries' Amended Complaint.

### Equitable Subordination

In Count X of Ries' Amended Complaint and Count VI of Kunkel's Second Amended Complaint, the trustees ask me to equitably subordinate the defendants' claims. Kunkel and Ries contend that the defendants' return · of the kited checks constitutes misconduct which conferred an unfair advantage on the banks, while unfairly affecting other creditors. In addition, the trustees argue that subordination would be in keeping with the Code.

Equitable subordination is a judicially created doctrine codified in § 510 of the Bankruptcy Code. *See United States v. Noland,* —— U.S. ——, ——, 116 S.Ct. 1524, 1526, 134 L.Ed.2d 748 (1996) ("The judge-made doctrine of equitable subordination predates Congress's revision of the Code in 1978."). Under the statute, a court may "subordinate for purposes of distribution all or part of an

---

16. Equitable considerations compel a similar result. Section 1–103 of the U.C.C. mandates the application of equitable principles to all code provisions unless expressly displaced. "Unless displaced by the particular provisions of this Act, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principle and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions." U.C.C. § 1–103. Section 4–302 does *not* specifically displace equitable principles. *First Nat'l Bank v. Fidelity Bank,* 724 F.Supp. 1168, 1172 (E.D.Pa. 1989) (holding that equitable defenses are not precluded under § 4–302). Accordingly, I conclude that equitable doctrines—including unclean hands and unjust enrichment—preclude the trustees from enforcing the midnight deadline.

allowed claim to all or part of another allowed claim...." 11 U.S.C. § 510(c)(1).

The Supreme Court first recognized the bankruptcy court's equitable power to subordinate claims in *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939). In *Pepper,* the Court noted that:

> [T]he bankruptcy court in passing on allowance of claims sits as a court of equity.... [I]n the exercise of its equitable jurisdiction the bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate.

*Id.* at 307–308, 60 S.Ct. at 245–246.

 A court's power to subordinate claims, although broad, is not without limit. *Benjamin v. Diamond (In re Mobile Steel Co.),* 563 F.2d 692, 699 (5th Cir.1977). In *In re Mobile Steel Co.,* the Fifth Circuit identified three factors which must be established before a claim can be equitably subordinated: The claimant must have engaged in inequitable conduct, the misconduct must have resulted in injury to the creditors or conferred an unfair advantage on the claimant, and equitable subordination must not be inconsistent with the provisions of the Code. *Id.* at 699–700. *See Bergquist v. Anderson–Greenwood Aviation Corp. (In re Bellanca Aircraft Corp.),* 850 F.2d 1275, 1282 (8th Cir.1988) (adopting three-part test of equitable subordination).

The majority of courts which have addressed the issue have required some finding of inequitable conduct on the part of the claimant.[17] *See Wegner v. Grunewaldt,* 821 F.2d 1317, 1323 (8th Cir.1987) ("In the absence of specific findings by the bankruptcy court as to the evidence supporting the presence of fraudulent or inequitable activity, a claim for equitable subordination will not stand."); *Farmers Bank v. Julian,* 383 F.2d 314, 323 (8th Cir.1967) (holding that fraud or unfairness is "essential for a decision to subordinate."). In *United States v. Noland,* —— U.S. ——, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996), the Supreme Court declined an opportunity to dispense with the misconduct requirement: "[W]e need not decide today whether a bankruptcy court must always find creditor misconduct before a claim may be equitably subordinated." *Id.* at ——, 116 S.Ct. at 1528.

 The level of misconduct necessary to support a claim for equitable subordination varies according to the relationship between the parties. If the claimant is an insider of the debtor, the court will closely scrutinize the claimant's conduct. In the instant case, Firstar Wausau and Firstar Milwaukee do not satisfy the statutory definition of an insider.[18]

 In light of the facts of this case, I feel it would require a creatively strained judicial construction to construe the defendants' actions as misconduct. Simply put: The defendants' legal dishonor of kited checks does not rise to the level of misconduct necessary to warrant the equitable subordination of their claims. In fact, I am hard pressed to describe the defendants' actions as *mis*conduct at all. Furthermore, I find it somewhat incongruous for the trustees to invoke an equitable remedy in the wake of the debtor's multi-million dollar check kiting scheme. Indeed, a bankruptcy court may

---

**17.** Courts which have dispensed with the misconduct requirement have done so in the context of tax penalty claims. *See Burden v. United States,* 917 F.2d 115, 120 (3d Cir.1990); *Schultz Broadway Inn v. United States,* 912 F.2d 230, 234 (8th Cir.1990); *In re Virtual Network Servs. Corp.,* 902 F.2d 1246, 1250 (7th Cir.1990).

**18.** Section 101 of the Code defines an insider as follows:

(A) if the debtor is an individual—
 (i) relative of the debtor or of a general partner of the debtor;

(ii) partnership in which the debtor is a general partner;
 (iii) general partner of the debtor; or
 (iv) corporation of which the debtor is a director, officer, or person in control;
(B) if the debtor is a corporation—
 (i) director of the debtor;
 (ii) officer of the debtor;
 (iii) person in control of the debtor;
 (iv) partnership in which the debtor is a general partner;
 (v) general partner of the debtor; or
 (vi) relative of a general partner, director, officer, or person in control of the debtor.

not invoke its equitable powers to perpetrate inequity. *See Pepper v. Litton,* 308 U.S. 295, 303–305, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939) (holding that equitable principles "have been invoked to the end that fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done.").

Since the trustees have failed to establish the first prong of the *Bellanca* test, it is unnecessary to reach the remaining factors. Therefore, I will grant the defendants' motion for summary judgment and deny Ries' motion on Count X of Ries' Amended Complaint and Count IV of Kunkel's Second Amended Complaint.

### Wrongful Dishonor

In Count XI of Ries' Amended Complaint and Count II of Kunkel's Second Amended Complaint, the trustees seek to recover millions of dollars from the defendants for the wrongful dishonor of checks drawn on the Morken and SGLE accounts. Wis.Stat. § 404.402 governs wrongful dishonor: "Except as otherwise provided in this Article, a payor bank wrongfully dishonors an item if it dishonors an item that is properly payable, but a bank may dishonor an item that would create an overdraft unless it has agreed to pay the overdraft." Wis.Stat. § 404.402.

Preliminary to a finding of wrongful dishonor is a determination than an item is "properly payable." In *Pulaski State Bank v. Kalbe,* 122 Wis.2d 663, 364 N.W.2d 162 (Ct.App.1985), the court determined that § 404.104(1)(I) confers discretion on banks to dishonor checks which are not backed by collectible funds. "The statute gives banks the option of dishonoring checks when sufficient funds are not available.... The bank may consider the check to be not properly payable and refuse to pay without risk of liability for wrongful dishonor." *Id.* 364 N.W.2d at 163.

In the instant case, the trustees argue that the dishonored items were properly payable since there were sufficient funds in the accounts at the time of presentment. However, the only "funds" in the accounts were *provisional* credits which Firstar Milwaukee automatically advanced to cover the anticipated disbursements. Shortly after advancing the funds, Firstar Milwaukee discovered that the deposits were not merely uncollected, but *uncollectible.* Once Firstar Milwaukee reversed the provisional postings, there were no longer any funds in the accounts from which the checks could be paid. Therefore, checks presented against the Morken and SGLE accounts were not properly payable under Wis.Stat. § 404.402.

Since the plaintiffs have failed to establish that the items presented against the accounts were properly payable, their wrongful dishonor claims fail as a matter of law. Therefore, I will grant summary judgment in favor of the defendants and deny summary judgment to the trustees on Count XI of Ries' Amended Complaint and Count II of Kunkel's Second Amended Complaint.

### *Service Fees and Suspense Account*

In Count XII of his Amended Complaint, Ries seeks to recover $3,337.92 in service fees from Firstar Milwaukee. Similarly, in Count XIII, Ries contends that Firstar Milwaukee misappropriated funds when it endorsed and deposited checks totaling $133,-808.65 into a "suspense account." Ries seeks recovery of the face value of the checks.

Following oral argument on the parties' summary judgment motions, Firstar Milwaukee reduced its proof of claim in the aggregate amount of $137,696.57, rendering Counts XII and XIII of Ries' Amended Complaint moot.

### *Ries' $90,000 Claim*

In the final count of his Amended Complaint, Ries seeks a $90,000 judgment against Firstar Milwaukee for depositing a check, made payable to SGLE, into the Morken account. Ries' count fails for several reasons.

First, Ries' claim is conceptually deficient. Mired in the metaphysics of Morken's check kite, Ries overlooks the fact that Firstar Milwaukee realized no tangible value from the transaction. By depositing the funds into the Morken account, Firstar Milwaukee

**164**

effected a small reduction in Morken's outstanding obligation to the bank. Even if Firstar Milwaukee had deposited the check into the funding account, the proceeds would only have marginally offset SGLE's sizeable debt to Firstar Milwaukee. Either way, Firstar Milwaukee has incurred an enormous loss, the sum of which will never be recovered.

Stated another way, Ries' claim fails simply because he seeks relief to which he is not entitled. Even if Firstar Milwaukee misdirected the check, Ries cannot recover the proceeds of the misdeposited check for distribution to creditors. At best, Ries can effect a reduction in SGLE's aggregate debt to Firstar Milwaukee by directing that the check be deposited into the funding account. While Ries may have grounds for objecting to the defendants' claims, he has no grounds to recover money. Since Ries seeks relief which cannot be granted, I will deny his motion and grant summary judgment to the defendants on Count XIV of his Amended Complaint.

### ORDER

THEREFORE, IT IS ORDERED THAT:

1. The plaintiffs' motions for summary judgment are denied.

2. The defendants' motion for summary judgment is granted.

3. The plaintiffs shall recover nothing from the defendants.

LET JUDGMENT BE ENTERED ACCORDINGLY.