724 F.Supp. 1168 (1989)
The FIRST NATIONAL BANK OF BOSTON
v.
FIDELITY BANK, NATIONAL ASSOCIATION.
Civ. A. No. 88-1611.
United States District Court, E.D. Pennsylvania.
November 3, 1989.
Warren T. Pratt, Philadelphia, Pa., for plaintiff.
Walter Weir, Jr., Klehr Harrison Harvey Branzburg Ellers & Weir, Andrew O. Schiff, Peter McGonigle, Philadelphia, Pa., for defendant.

MEMORANDUM AND ORDER
FULLAM, Chief Judge.
This dispute between two banks over a mis-handled check transaction requires the court to explore some of the consequences which automation has visited upon the respective legal liabilities of banks under Article 4 of the Uniform Commercial Code, which was enacted before the advent of computerized check-processing.
The method of processing checks now in universal use in the United States, Magnetic Ink Character Recognition (MICR) was first adopted by the American Bankers Association in 1956, and has been in common use since the mid-1960s. See Note, Computerized Check-Processing and the Bank's Duty to Use Ordinary Care, 65 Tex.L.R. 1173-74 (1987). The form of each bank check is preprinted with magnetic characters, along the bottom of the check, toward the left-hand side. These characters designate the bank upon which the check is drawn, and the account number of the maker. When a check is presented to another bank (the "depositary bank"), that bank adds additional magnetic encoding, at the lower right-hand side of the check, specifying the amount of the check. From that point on, the check works its way through the bank clearing system to the bank on which the check is drawn (the "payor" bank) and is charged against the maker's account  all without further human intervention. *1169 Thus, the role of the encoder at the depositary bank (which then assumes the role of "collecting" bank as well), is crucial, since all subsequent steps in the processing of the check for payment depend upon the accuracy of the encoded information; ordinarily, no other human being actually examines the check from that point on. The development of this method of processing checks, it is generally agreed, has enabled the banking system to meet the needs of our ever-expanding economy. A bank such as the defendant, for example, routinely processes upwards of 300,000 checks daily.
The parties have stipulated the facts pertinent to their dispute. Plaintiff is the First National Bank of Boston (hereinafter "Boston"). The defendant is Fidelity Bank, National Association, successor to Industrial Valley Bank (hereinafter "Fidelity"). On or about September 22, 1986, one of defendant's customers, New York City Shoes ("NYC") issued a check in the amount of $100,000, to the Maxwell Shoe Company ("Maxwell"). The check was drawn on one of NYC's accounts at Fidelity in Philadelphia. Maxwell, a New England concern, deposited the check in its account at Boston, which credited Maxwell's account with the face amount of the check, and then proceeded to process the check through the Federal Reserve system. The check was properly encoded by Boston, and duly presented to Fidelity for payment. But NYC's account did not contain sufficient funds to cover the check, and Fidelity therefore returned the check to Boston for "non-sufficient funds".
Boston did not charge Maxwell's account because of the uncollectability of the check, but instead, at Maxwell's request, undertook to re-present the check to Fidelity. In order to re-process the check, Boston attached a "tape skirt" to the bottom of the check, and thereon re-encoded the check so that it could be processed through the Federal Reserve system. Unfortunately, however, Boston's encoder made an error, and encoded the amount of the check as $10,000, rather than $100,000. The computers which processed the check were, of course, unaware of the error and unable to appreciate it. When the check arrived at Fidelity, it was charged against NYC's account in the amount of $10,000, and that sum was duly forwarded to Boston. At that point, the error surfaced.
Boston made demand on Fidelity for the $90,000 difference between the face amount of the check and the amount which Fidelity had paid. The initial demands were made by telephone. On each occasion, Fidelity explained that it was unable to honor the request, because NYC's account continued to be insufficient to cover it. The first telephone demand was made by Boston on October 14, 1986. A second such demand was made on October 17, 1986. On both occasions, NYC's account lacked sufficient funds to honor the $90,000 request. On the latter occasion, Fidelity further explained that, under Fidelity's internal operating procedures, oral requests for "adjustments" could not be honored, and it would therefore be necessary for Boston to submit a written request for "adjustment".
On October 27, 1986, Boston submitted its written adjustment request, which was received by Fidelity's Adjustment Department on November 3, 1986. On that date, NYC's account showed a balance of $171,077.60, but $158,000 of that sum represented uncollected funds. The collected and available balance in the account was only $13,077.67. The following day, November 4, 1986, NYC's account was reduced by the payment of four other checks, totaling $155,148 (all of which were drawn against uncollected funds, but all of which were honored). By virtue of these checks and certain other transactions (a returned deposit and a charge against the account in an unrelated transaction), the ending balance in NYC's account on November 4, 1986 was $2,789.67.
Boston's adjustment request was assigned to a clerk for processing on November 5, 1986. In checking Fidelity's records, the clerk ascertained that the check had originally been presented as a $100,000 item, and had been duly returned for non-sufficient funds. Accordingly, the clerk concluded that the transaction had been *1170 handled properly, and that no adjustment would be appropriate. For some reason, the clerk did not learn of the second presentation, the encoding error, etc.
Boston resubmitted its written adjustment request on November 17, 1986. At that point, NYC's account was overdrawn. At no time between September 22, 1986 and November 21, 1986, when NYC's account was closed, did NYC's account contain sufficient collected funds to cover Maxwell's $100,000 check, or the balance remaining after the initial payment of $10,000.
Because of the unusual nature of several transactions in NYC's account  a large number of checks drawn against uncollected funds, and a large number of deposits which later proved to be uncollectible  the account had come to the attention of Fidelity's Security Division in July of 1986. As a result of the investigation, Mr. Donald Ebner, vice-president in charge of security at Fidelity, decided to end Fidelity's banking relationship with NYC. By agreement, all of NYC's accounts at Fidelity were closed, as of the end of business on November 21, 1986.
At the start of business the next banking day, November 24, 1986, Mr. Ebner had in his possession, ready for delivery to NYC, a check representing the combined balances of all of NYC's accounts which had just been closed  a total of $101,383.61. That same morning, Mr. Ebner received from Fidelity's Adjustment Department the adjustment request which had been resubmitted by Boston, seeking the $90,000 balance on the Maxwell check. NYC, however, refused to permit Fidelity to use funds from any of its other accounts to make good the Maxwell check; and, since the account on which the check had originally been drawn was insufficient to cover it, Mr. Ebner rejected the adjustment request, and delivered to NYC the $101,383.61 check closing out its various accounts.
After this final rejection of Boston's adjustment request, Boston attempted to collect the $90,000 from NYC. An agreement was reached for NYC to pay off the balance in installments. NYC paid a total of $40,000 on account, but then defaulted and, on July 7, 1987, filed for bankruptcy.
In this action, Boston seeks to recover from Fidelity the $50,000 remaining unpaid, and also requests a declaratory judgment which would require Fidelity to indemnify Boston in the event the Bankruptcy Court determines that all or any part of the $40,000 previously paid by NYC constitutes a voidable preference.
As the foregoing recital demonstrates, the court is presented with two separate but related sets of questions. The first is the liability of Fidelity as payor bank, for having paid only $10,000 when the check was in the amount of $100,000, and the effect of Boston's encoding error on that liability. The second area of inquiry centers upon Fidelity's handling of the adjustment request, and its payout to NYC notwithstanding its awareness of Fidelity's adjustment request.

I.
Under the provisions of the Uniform Commercial Code (UCC), the liability of a bank is determined by the law of the jurisdiction in which the bank is located. UCC § 4-102(2). Thus, Boston's liability is governed by Massachusetts law, Fidelity's by Pennsylvania law. Fortunately, the UCC has been adopted in substantially the same form in both jurisdictions. Compare 13 Pa.Cons.Stat.Ann. § 4213(a) (Purdon's 1984) with Mass.Gen.Laws Ann. Ch. 106, § 4-213(1) (West 1958).
Section 4-213(1) of the UCC provides:
"... An item is finally paid by a payor bank when the bank has done any of the following, whichever happens first:
. . . . .
"(c) Completed the process of posting the item to the indicated account of the drawer, maker or other person to be charged therewith ...
. . . . .
"Upon final payment under subparagraphs (b), (c) or (d), the payor bank shall *1171 be accountable for the amount of the item."[1]
Boston's argument is straightforward: Fidelity did post the check against NYC's account on October 3, 1986, and is therefore, under the plain language of the statute, accountable to Boston "for the amount of the item". The fact that Fidelity listed the item in the wrong amount is irrelevant, since it is undisputed that Fidelity "completed the process of posting the item to the indicated account of the drawer" on October 3, 1986.
The defendant, on the other hand, argues that, for purposes of § 4-213(1) the "amount of the item" for which the payor bank must account should be the encoded amount of the check, rather than its actual face amount. Alternatively, the defendant contends that equitable principles mandate rejection of plaintiff's claims.
Both parties find support for their respective positions in Georgia R.R. Bank & Trust Co. v. First National Bank & Trust Co. of Augusta, 139 Ga.App. 683, 229 S.E.2d 482 (1976), aff'd per curiam, 238 Ga. 693, 235 S.E.2d 1 (1977). The facts of that case are strikingly similar to the present case: plaintiff bank erroneously encoded a $25,000 check as a $2500 check. The defendant, the payor bank, charged the drawer's account in the lesser amount, and remitted that sum to plaintiff. The error was not discovered for several weeks, by which time the cancelled check had already been returned to the maker. When plaintiff made demand upon the defendant, the defendant brought the error to the maker's attention, but the latter refused to allow the defendant to charge his account with the additional $22,500. The Georgia court held, without extended discussion, that the defendant was liable to the plaintiff for the face amount of the check, pursuant to UCC § 4-213(1), and also pursuant to the "midnight deadline" provisions of § 4-302. The court reasoned that the defendant had made "final payment" by charging the maker's account, albeit in the wrong amount, and that it was therefore liable as payor for the full amount of the check; and that, alternatively, it had retained the check beyond the midnight deadline without "completely settling for it".
Although the actual holding of the Georgia R.R. Bank & Trust Co. case plainly supports plaintiff's arguments, one part of the court's explanation for its decision suggests that the true rationale for the decision is one which vindicates defendant's position in the present case: the court made much of the fact that, at all times, the maker's account contained more than sufficient funds to honor the check in its full amount. The court stated:
"We are not here concerned with a situation wherein the drawee cannot recover from the drawer the amount of the deficiency. In such a situation, there would possibly exist a defense or counterclaim in favor of the drawee bank against the collecting bank which had under-encoded the check. See J. Clarke, Mechanized Check Collection, supra at 1004. The record in the present case shows that the drawer's account contained sufficient funds, as of the date payment was demanded by plaintiff, to cover the deficiency. 229 S.E.2d at p. 484.[2]
It thus appears that, to the extent liability is sought to be imposed under the "final payment" rule of § 4-213(1), the Georgia court might well sustain an equitable defense where plaintiff's encoding error caused the payor bank to suffer a loss which it could not avoid by charging its customer's account. Recognition of such equitable defenses is more problematical when liability is sought to be imposed under *1172 the "midnight deadline" provisions of § 4-302. With due deference to the views of the Georgia courts, however, I am not persuaded that § 4-302 has any application in these circumstances. The whole purpose of the "midnight deadline" rule is to promptly remove uncertainties concerning the collectability of a check, and to enable depositary and collecting banks to rely upon the payor's silence as an unconditional assurance of collectability. If the payor bank acts before the deadline, it seems to me, § 4-302 is no longer implicated.
Like the Georgia court, however, I reject the argument that the "amount of the item" for § 4-213(1) purposes is the encoded amount, rather than the face amount, of the check. Stated that broadly, the argument is manifestly unacceptable, for if the encoded amount were greater than the face amount of the check, the error would produce a windfall for the collecting bank, and patently unjustifiable increases in the potential liability of the payor bank, the maker, or both. Any such rule would have chaotic repercussions, and would be totally inconsistent with the scheme of the UCC.
A more narrowly stated rule  that the "amount of the item" for purposes of § 4-213(1) is the face amount of the check or the encoded amount, whichever is less  is merely another way of stating what I conceive to be the true thrust of defendant's argument in this case, namely, that as between the encoding bank and all other banks in the collecting process, including the payor bank, the encoder is estopped from claiming more than the encoded amount of the check. Framing the argument in terms of estoppel is, I believe, preferable, in that it avoids the problems inherent in trying to ascribe different meanings to the same words in various parts of the UCC.
Section 1-103 of the UCC preserves equitable principles and common-law tort law, except where inconsistent with specific UCC provisions. Most of the decided cases have arisen under the "midnight deadline" provisions of § 4-302, which mandates automatic liability for missing the acceptance deadline "in the absence of a valid defense such as breach of a presentment warranty, settlement effected, or the like." In Bank Leumi Trust Co. v. Bank of Mid-Jersey, 499 F.Supp. 1022 (D.N.J.), aff'd without opinion, 659 F.2d 1065 (3d Cir.1981), it was held that the quoted language precludes assertion of an equitable defense based upon mis-encoding, where the payor bank failed to act before the deadline. In Chrysler Credit Corp. v. First National Bank & Trust Co., 746 F.2d 200 (3d Cir.1984), however, the Court of Appeals expressly declined to consider whether the defense of equitable estoppel could be asserted in a "midnight deadline" case, because the evidence in that case did not adequately support the asserted defense. The court made clear that, at the very least, the facts giving rise to the claimed estoppel would have to be such as to have been a cause of the payor's failure to meet the "midnight deadline".
Whether or not equitable defenses are available in "midnight deadline" cases, I am satisfied that such defenses are not precluded under § 4-302. That appears to be the view of most commentators. See, e.g., Clark, The Law of Bank Deposits, Collections and Credit Cards, ¶ 10.5 [3]; J. Clarke, Mechanized Check-Collection, 14 Bus.L. 989, 1004 (1959); Note, Computerized Check-Processing and a Bank's Duty to use Ordinary Care, 65 Tex.L.R. 1173 (1987). The proposed ALI/NCCUSL revisions to Article 4 (specifically, revised § 4-207) would explicitly provide that an encoding bank warrants the accuracy of encoded amounts, and is liable for any resulting loss; this on the theory that the encoding bank is the party best able to avoid the loss. See Rubin, Policies and Issues in the Proposed Revision of Articles 3 and 4 of the UCC, 42 Bus.Law. 621, 653 (1988); NCCUSL, Amendments to Uniform Commercial Code, Article 4-Bank Deposits and Collections, § 4-207 (tentative draft October 19, 1988).
In my view, most, if not all, of the reported decisions can readily be harmonized with the existence of the right of the payor bank to hold the encoding bank liable for any under-encoding error, if this equitable right is considered in conjunction with the obligation to mitigate damages. That is, the *1173 payor bank has the corollary obligation of attempting to avoid loss altogether, by recourse to the account of the maker of the check. If the maker's account, when the check is correctly presented, is insufficient to cover the item, the payor bank has a claim against the encoding bank, which it can offset against any claim made by the encoding bank under § 4-213(1).
I therefore conclude that Fidelity may not be held liable to plaintiff under § 4-213(1) of the UCC, the "final payment" rule.

II.
Plaintiff's alternative claim that the defendant is liable for mis-handling plaintiff's "adjustment" request, and for permitting NYC to close out its accounts without honoring the check in question, is readily disposed of. At no time during the entire period did the account on which the check was drawn contain sufficient collected funds to cover the correct amount of the check (or, more particularly, the $90,000 balance due on that check). Thus, Fidelity was never in a position to honor the adjustment request, and any error or negligence in the processing of the adjustment request was inconsequential.
It is true that, by the time Fidelity released $101,383.61 to NYC on November 24, 1986, it was fully aware of plaintiff's adjustment request and the circumstances which occasioned it. But when NYC insisted upon receiving the entire balance from all of its accounts, Fidelity was obliged to comply. The underlying check, and plaintiff's adjustment request, established no basis for a charge against any account but the one upon which the check was drawn; and that account was insufficient. In the circumstances, Fidelity had no legal right to freeze NYC's other accounts, and certainly had no obligation to do so.
For all of the foregoing reasons, judgment will be entered in favor of the defendant.
NOTES
[1] A payor bank can also become unconditionally accountable for the amount of a check by failing to return it or give written notice of dishonor by midnight of the banking day next following the day on which the item was received (i.e., by missing the so-called "midnight deadline"). That issue is not involved in this case.
[2] The per curiam affirmance by the Supreme Court of Georgia reflects a similar rationale, in noting that the maker's refusal to permit the defendant to charge his account was a nullity, since it was then too late for him to issue a stop-payment order.