**Rel: 09/30/2014**

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0649), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## SPECIAL TERM, 2014

_____

### 1130040

_____

**Troy Bank and Trust Company**

v.

**The Citizens Bank**

**Appeal from Geneva Circuit Court**
**(CV-11-0049)**

PARKER, Justice.

Troy Bank and Trust Company ("Troy Bank") appeals a summary judgment entered in favor of The Citizens Bank ("Citizens Bank") by the Geneva Circuit Court ("the circuit

court").  We reverse the circuit court's judgment and remand the cause.

Facts and Procedural History

In its order entering a summary judgment in favor of Citizens Bank, the circuit court set forth the following relevant, undisputed facts:

> "1. On 12/10/09 Ronnie Gilley Properties, LLC, ('Gilley' hereinafter) issued a check in the amount of $100,000.00 payable to Cile Way Properties, LLC, ('Cile' hereinafter). The check was drawn on the account held by Gilley at Troy Bank.
>
> "2. On 12/16/09, Cile deposited the check to its account at Citizens Bank.
>
> "3. Citizens Bank presented the check for payment through the Federal Reserve Board ('FRB' hereinafter) and mis-encoded/under-encoded[1] the amount of $1000.00 instead of $100,000.00.
>
> "4. On the date [the check was] presented to Troy Bank[,] Gilley's account[,] which contained a balance of $199,083.39[,] was debited $1000.00

---

[1]Troy Bank provides the following explanation of "encoding" in its brief:

> "'Encoding' refers to the process whereby a party (typically a depositary bank) puts information on a check (such as the amount of the check being deposited) using Magnetic Ink Character Recognition ('MICR'). The MICR line on a check can then be -- and is -- read and processed electronically by other parties."

Troy Bank's brief, at p. 5 n.1.

instead of $100,000.00 because of Citizens Bank's encoding error. Cile's account was credited $1000.00 at Citizens Bank.

"5. On 01/22/10 Citizens Bank discovered the mistake and sent an adjustment through the FRB for the under-encoded amount of $99,000.00.

"6. Upon receipt of the adjustment notice, Troy Bank honored the notice and made final payment of $99,000.00 which was credited to Cile's account at Citizens Bank.[2]

"7. Troy Bank never returned the item or sent written notice of dishonor to Citizens Bank.

"8. On 03/17/10, Troy Bank sent a letter to Citizens Bank demanding payment in the amount of $98,436.43 for damages it claimed to have suffered as a result of the encoding error because Gilley's account held insufficient funds on the date final payment of the $99,000 was made."

On April 20, 2011, Troy Bank sued Citizens Bank seeking to recover damages Troy Bank claimed to have suffered as a result of the encoding error made by Citizens Bank. Troy Bank alleged that it was entitled to recover damages under Alabama's check-encoding warranty, which is set forth in § 7-4-209, Ala. Code 1975, and states, in pertinent part:

---

[2]Troy Bank states in its brief, and Citizens Bank does not dispute, that the Federal Reserve Bank, at which Troy Bank has an account, paid Citizens Bank's adjustment notice immediately upon receipt of the adjustment notice; payment of the adjustment notice to Citizens Bank did not require Troy Bank to take any action.

"(a) A person who encodes information on or with respect to an item after issue warrants to any subsequent collecting bank and to the payor bank or other payor that the information is correctly encoded. If the customer of a depositary bank encodes, that bank also makes the warranty.

"....

"(c) A person to whom warranties are made under this section and who took the item in good faith may recover from the warrantor as damages for breach of warranty an amount equal to the loss suffered as a result of the breach, plus expenses and loss of interest incurred as a result of the breach."

On May 15, 2013, Citizens Bank filed a motion for a summary judgment and a brief in support of its motion, which it later amended. Citizens Bank argued that it was not strictly liable for its encoding error under § 7-4-209 but that Troy Bank "had an obligation to mitigate its damages and attempt to avoid loss altogether. [Troy Bank] failed to do this when it sent no written notice of dishonor or nonpayment before its midnight deadline and it allowed final payment to be made from [Gilley's] account ...."

On August 6, 2013, Troy Bank filed a response to Citizens Bank's summary-judgment motion. Troy Bank argued:

"Troy Bank had already become accountable for the full amount of the item when the under encoded check was initially presented for payment and paid in the amount for which it was under encoded. The issue no

4

longer is whether Troy Bank is liable for the full amount of the check. Instead, the issue is whether Troy Bank was able to mitigate its losses by charging the drawer's account for the remaining balance of the check (and Citizens [Bank] does not dispute that there were not sufficient funds in the account to pay the $99,000.00 when Troy Bank received the adjustment notice), and if not, whether Troy Bank is entitled to shift the loss to the depositary bank (Citizens [Bank]) who under encoded the check. UCC § [7-]4-209 says Troy Bank is entitled to shift that loss."

Troy Bank also noted that Citizens Bank's motion for a summary judgment could have been "read to suggest that Federal Operating Circular No. 3 preempts the Uniform Commercial Code or imposes additional obligations on payor banks with respect to under encoded checks." Troy Bank argued in its response to Citizens Bank's summary-judgment motion:

1130040

"[T]he scope provisions of the UCC[3] and Operating

---

[3]This is a reference to § 7-4-103, Ala. Code 1975, which provides:

"(a) The effect of the provisions of this article may be varied by agreement, but the parties to the agreement cannot disclaim a bank's responsibility for its lack of good faith or failure to exercise ordinary care or limit the measure of damages for the lack or failure. However, the parties may determine by agreement the standards by which the bank's responsibility is to be measured if those standards are not manifestly unreasonable.

"(b) Federal Reserve regulations and operating circulars, clearing-house rules, and the like have the effect of agreements under subsection (a), whether or not specifically assented to by all parties interested in items handled.

"(c) Action or non-action approved by this article or pursuant to Federal Reserve regulations or operating circulars is the exercise of ordinary care and, in the absence of special instructions, action or non-action consistent with clearing-house rules and the like or with a general banking usage not disapproved by this article, is prima facie the exercise of ordinary care.

"(d) The specification or approval of certain procedures by this article is not disapproval of other procedures that may be reasonable under the circumstances.

"(e) The measure of damages for failure to exercise ordinary care in handling an item is the amount of the item reduced by an amount that could not have been realized by the exercise of ordinary care. If there is also bad faith it includes any other damages the party suffered as a proximate consequence."

6

Circular 3 make it clear that the operating procedure which allows the parties to resubmit items back through the Fed[eral Reserve Bank] when there has been an encoding error is not inconsistent with the ability of a bank to pursue a warranty claim against an encoding bank under ... § [7-]4-209. There is no inconsistency. The procedure for remitting items through the Fed[eral Reserve Bank] to correct errors operates in a narrow 'sphere' to provide a shorthand procedure for resolving issues where a check has been under encoded and funds remain available to pay the proper amount of the check. It is not intended to undo the effect of ... § [7-]4-209, which was adopted to place losses on the depositary bank that under encodes a check. Citizens [Bank's] use of the short-hand procedure in an effort to obtain payment of the additional $99,000.00 shortfall caused by its encoding error did not obligate Troy Bank to utilize that shorthand procedure to reject the payment request. There is nothing inconsistent with an expedited procedure for determining who holds the funds when there is a dispute and a separate mechanism under the UCC that determines the liability of the parties and resolves the matter in favor of Troy Bank."

Troy Bank also attached to its response the affidavit of Gayla Kinney, an employee of Troy Bank with personal knowledge of the facts and circumstances related to the encoding error made by Citizens Bank, which had attached to it "documents relating to the Federal Reserve Circular dealing with under encoded items." A page of Operating Circular 3 was attached to Kinney's affidavit, which states, in pertinent part:

"20.7 Underencoded item

1130040

"A bank may request an adjustment based on a claim that the MICR encoded amount of a cash item or returned check is less than the true amount of the item, if the bank sent the item to us [a Federal Reserve Bank] and received settlement for it in the encoded amount. The request must be received by a Reserve Bank within six calendar months after the item was credited to the requesting bank, and must provide all information that the Reserve Banks require, including a photocopy of the front and back of the item that clearly shows the amount of the encoding error (words control over figures in determining the true amount of the item). The requesting bank's Administrative Reserve Bank will provisionally credit the bank in the amount of the difference between the encoded amount and the true amount of the item. A Reserve Bank will charge that amount[,] and send the documentation to, the bank to which the Reserve Bank presented or returned the item. However, the Administrative Reserve Bank reserves the right not to credit the requesting bank if a Reserve Bank is unable to charge the paying or depository bank.

"20.8 Revocation of Adjustments for Underencoded items

"The requesting bank's Administrative Reserve Bank will revoke part or all of the credit given to the bank, and a Reserve Bank will recredit the paying or depository bank, if a Reserve Bank receives a statement as provided below from the paying or depository bank, within twenty banking days after the Reserve Bank charged the paying or depository bank for the undercoding claim. The statement must be in a format we prescribe that is signed by an officer of the paying or depository bank, and:

"(a) state that the paying or depository bank had charged its customer for the encoded amount of the item and is

8

1130040

> unable to recover all or a specified
> portion of the difference between the
> encoded amount and the true amount of the
> item by charging the account of the
> customer, and
>
> "(b) request an adjustment in that
> specified amount, based on a claim of
> breach of warranty with respect to the
> encoding error."

Also attached to Kinney's affidavit was a "Claim of Damage Due to Underencoding Adjustment" form, which, Kinney stated in her affidavit, "is [a form] used in connection with underencoded items and it states that a bank which suffered a loss due to an encoding error has twenty (20) banking days to submit a claim through the Federal Reserve system." The pertinent portion of the form reads:

> "This form must be received by the Reserve Bank
> within 20 banking days after the date the Reserve
> Bank sent the documentation to support the encoding
> error charge. The advice of charge must accompany
> the form. Failure to provide all information will
> result in the claim being rejected.
>
> "Although late responses will be rejected by the
> Reserve Bank, you may nonetheless be able to recover
> from the claimant, but you must deal directly with
> the claimant."

(Emphasis added.)

9

1130040

On August 28, 2013, following a hearing, the circuit court entered a summary judgment in favor of Citizens Bank, stating:

"Citizens Bank breached the encoding warrant[y] when it erroneously encoded the amount of $1000.00 instead of $100,000.00. The erroneous amount was paid by Troy Bank from Gilley's account, received by Citizens Bank and deposited to Cile's account. Because the erroneous amount was less than the correct amount, and there was sufficient funds in Gilley's account to cover the erroneous amount, Troy Bank, at that point, had suffered no loss or damages. § 7-4-209(c)[, Ala. Code 1975,] provides 'A person to whom warranties are made under this section and who took the item in good faith may recover from the warrantor as damages for breach of warranty an amount equal to the loss suffered as a result of the breach plus expenses and loss of interest incurred as a result of the breach.' Under this provision for damages resulting from encoding error Citizens Bank was not liable to Troy Bank at that time. Troy Bank had taken the item in good faith and Citizens Bank had breached the warranty, but there was no damage because Gilley's account had sufficient funds to cover the under-encoding error.

"To remedy the error Citizens Bank sent an adjustment notice through the Federal Reserve Bank Clearing House for the under-encoded amount of $99,000.00.

"When Troy Bank received the adjustment notice it could have dishonored and refused final payment of the request because there were insufficient funds in Gilley's account. But, Troy Bank honored the request without objection. Troy Bank failed to confirm that the funds were available before honoring the notice or by acting before the midnight deadline which would have avoided (mitigated) its

10

loss. Had it done so, the loss would have been Citizens Bank's loss caused by its encoding error. But, because Troy Bank did not refuse final payment and give written notice of dishonor before the midnight deadline, it is accountable for the loss under the provisions of § 7-4-301 and -302[, Ala. Code 1975].

"There is no evidence that Troy Bank complied with the FRB [Federal Reserve Bank ('FRB')] Circular by filing the Claim of Damage Due to Underencoding Adjustment within 20 days as required or that the claim was filed at all. Therefore, the adjustment notice should have been treated no differently than and is subject to the same law and regulations as the initial transaction.

"Troy Bank is not entitled to recover as a matter of law because it did not return the item or send written notice of dishonor before the midnight deadline. Troy Bank amply made final payment; it is strictly liable for the loss which means any issues of negligence are irrelevant. Citizens Bank's encoding error did not cause [Troy Bank's] loss. Troy Bank's loss was not a result of the breach as required by § 7-4-209. The $99,000 was deposited to Cile's account and Citizens Bank and Cile relied upon the finality of the transaction. Paraphrasing from Citizens Bank's conclusion to its brief, to permit Troy Bank to repudiate the payment would destroy the certainty which must pertain to commercial transactions if they are to remain useful to the business public. If this is not the case, when would Citizens Bank and Cile have known when they could have relied safely on the check being paid?

"If this court is in error by holding that the adjustment notice had to be treated the same as the initial transaction by Troy Bank pursuant to § 7-4-301 because the FRB policy was not complied with, the court holds, as a matter of law, that Troy

1130040

Bank's loss was the direct result of its own negligence and it is not entitled to recover.

"Therefore, summary judgment is rendered in favor of Defendant, Citizens Bank."

Troy Bank appealed.

Standard of Review

Troy Bank and Citizens Bank agree that the underlying facts are not in dispute. See Troy Bank's brief, at p. 9, and Citizens Bank's brief, at p. 6. This Court has held that when "the underlying facts are not disputed and [the] appeal focuses on the application of the law to those facts, there can be no presumption of correctness accorded to the trial court's ruling, and this Court must review that application of the law de novo." Beavers v. County of Walker, 645 So. 2d 1365, 1373 (Ala. 1994) (citing First Nat'l Bank of Mobile v. Duckworth, 502 So. 2d 709 (Ala. 1987), and Barrett v. Odom, May & DeBuys, 453 So. 2d 729 (Ala. 1984)).

Discussion

This case involves Alabama's check-encoding warranty ("the encoding warranty") set forth above. Troy Bank argues that the encoding warranty "makes clear that any party that encodes a check warrants the correctness of that information

12

and is liable for <u>any</u> loss due to an encoding error." Troy Bank's brief, at pp. 13-14. Troy Bank argues that the summary judgment in favor of Citizens Bank was in error based on the plain language of the encoding warranty.

Initially, we must address the issue of which law applies in this case. In its brief, Citizens Bank agrees that it breached the encoding warranty, but it argues that "binding federal banking regulations and operating circulars" prevent Troy Bank from recovering under the encoding warranty and, contrary to the encoding warranty, shift liability to Troy Bank. Specifically, Citizens Bank argues that Regulation CC, 12 C.F.R. § 229 et seq., and Operating Circular No. 3 set forth a claim procedure ("the claim procedure") that Troy Bank failed to follow. Citizens Bank argues that Troy Bank's failure to follow the claim procedure rendered Troy Bank strictly liable for any loss it suffered in relation to Citizens Bank's encoding error. Citizens Bank does not argue that the encoding warranty in this case is preempted by the claim procedure; rather, it argues that the claim procedure complements the encoding warranty and, thus, must be followed to recover damages under the encoding warranty. We disagree.

1130040

As set forth above, in drafting the form to be used to initiate the claim procedure, the Federal Reserve Bank clearly stated that the claim procedure was not the exclusive recovery method for a bank that had suffered a loss due to an encoding error made by another bank but expressly recognized that recovery could be pursued by the bank that had suffered the loss outside the claim procedure by dealing directly with the misencoding bank. In fact, as Troy Bank notes, Operating Circular No. 3 states in subsection 20.1 that "[a] bank may need to pursue other kinds of claims directly with another bank or by making a legal claim rather than, or in addition to, an adjustment request." (Emphasis added.) As Troy Bank argues on appeal, it was not required to use the claim procedure but, instead, chose to pursue recovery under the encoding warranty.

We note that § 7-4-103(a), Ala. Code 1975, states that "[t]he effect of the provisions of this article may be varied by agreement" and that § 7-4-103(b) states that "Federal Reserve regulations and operating circulars ... have the effect of agreements under subsection (a)." However, § 7-4-103 should not be read to obviate the encoding warranty.

14

1130040

Under § 7-4-103, it is only "<u>when the customer uses the</u> <u>system</u>" that the customer, "in effect, agrees to use the system's rules." 5 Thomas M. Quinn, <u>Quinn's Uniform</u> <u>Commercial Code Commentary and Law Digest</u> § 4-103[A][1] (rev. 2d ed. 2010) (emphasis added). Had Troy Bank pursued recovery under the claim procedure, it would have been bound by the applicable federal regulations. As set forth above, however, Troy Bank chose not to use the claim procedure but sought recovery under the encoding warranty. Therefore, because Troy Bank filed its action under § 7-4-209 and Citizens Bank has failed to direct this Court's attention to any authority indicating that the claim procedure was the exclusive method of recovery available to Troy Bank, the encoding warranty alone controls this case.[4]

---

[4]We note that Citizens Bank also argues that Troy Bank's claim under the encoding warranty is barred by a federal statute of limitations set forth in 12 C.F.R. § 229.38(g):

"Any action under this subpart may be brought in any United States district court, or in any other court of competent jurisdiction, and shall be brought within one year after the date of the occurrence of the violation involved."

Citizens Bank's argument is wrong for two reasons.

First, as set forth above, Troy Bank filed this action under § 7-4-209, not under 12 C.F.R. § 229 et seq. Therefore,

15

1130040

Having determined that the encoding warranty is the applicable law in this case, we now address the merits of the parties' arguments concerning the encoding warranty. First, we note that there is no Alabama caselaw discussing the encoding warranty, which was effective January 1, 1996, and which was adopted directly from the 1990 official revisions to Article 4 of the Uniform Commercial Code ("the UCC"). In fact, we have not been able to find a case in any jurisdiction in the United States applying UCC § 4-209. Accordingly, some general background information regarding the encoding warranty is beneficial to our discussion, given the lack of caselaw involving some of the issues presented in this case. Concerning the encoding warranty generally:

> "A major impetus for amendment of Article 4 [of the UCC] was the desire to modernize its provisions to reflect the automated processing methods that

the one-year statute of limitations has no relevance or applicability to this case.

Second, Citizens Bank did not assert this affirmative defense in the circuit court; thus, we cannot consider this argument for the first time on appeal. Ameriquest Mortg. Co. v. Bentley, 851 So. 2d 458, 465 (Ala. 2002)("This Court can affirm the judgment of a trial court on a basis different from the one on which it ruled, Smith v. Equifax, 537 So. 2d 463 (Ala. 1988), but the constraints of procedural due process prevent us from extending that principle to a totally omitted affirmative defense.").

16

> were introduced shortly after Article 4 was originally promulgated. The use of Magnetic Ink Character Recognition (MICR) encoding and high-speed sorters and computers posed some issues that the codification based on manual processing simply did not address adequately. For example, the MICR information has to be encoded on a check, a task generally undertaken by the depository bank. Revised Article 4 fills a void by addressing the consequences of misencoding."

William H. Lawrence, Changes in Check Collection and Access to Funds: Regulation CC and Revised UCC Article 4, 61 J. Kan. B.A. 26, 32-33 (July 1992). Lawrence's Anderson on the Uniform Commercial Code states that "U.C.C. § 4-209 [Rev.] provides rules for determining which party will suffer the loss resulting from payment of an erroneously encoded item. It allocates the loss through the encoding warranties." 7 Lary Lawrence, Lawrence's Anderson on the Uniform Commercial Code § 4-209:5 (3d ed. 2007); see also James J. White & Robert S. Summers, Uniform Commercial Code § 20-6c. (4th ed. 1995)("[R]evised 4-209 ... gives a claim against the 'person who encodes.'").

However, before we turn our attention to the issue whether the encoding warranty shifts liability for the encoding error from Troy Bank to Citizens Bank, we first consider Troy Bank's liability for the full $100,000 amount of

17

the check. It is important to note that the parties agree that Troy Bank became liable for the full $100,000 amount of the check; the parties disagree, however, as to when Troy Bank became liable for the full amount of the check. The circuit court -- apparently applying the "final-payment" and "midnight-deadline" rules set forth in §§ 7-4-215 and 7-4-301, Ala. Code 1975, respectively (which are set forth below) -- determined that Troy Bank became liable for the full amount of the check when the adjustment notice was paid and Troy Bank failed to "return the [adjustment notice] or send written notice of dishonor before the midnight deadline." Citizens Bank agrees with the circuit court's conclusion. Troy Bank argues that it became liable for the full amount of the check at the time the check was presented to Troy Bank, and it paid the underencoded amount and did not dishonor the check by its midnight deadline. For the reasons set forth below, we agree with Troy Bank.

Simply, "[f]inal payment occurs when a payor bank pays the item or settles for the item and the time frame for revoking that settlement has expired." Texas Stadium Corp. v. Savings of America, 933 S.W.2d 616, 619 (Tex. App. 1996).

18

1130040

Under Alabama law, § 7-4-215 sets forth the "final-payment rule," which dictates when an item is finally paid. Section 7-4-215 states, in pertinent part:

>     "(a) An item is finally paid by a payor bank when the bank has first done any of the following:
>
>         "(1) Paid the item in cash;
>
>         "(2) Settled for the item without having a right to revoke the settlement under statute, clearing-house rule, or agreement; or
>
>         "(3) Made a provisional settlement for the item and failed to revoke the settlement in the time and manner permitted by statute, clearing-house rule, or agreement.
>
>     "(b) If provisional settlement for an item does not become final, the item is not finally paid."

However, § 7-4-215 must be read in conjunction with § 7-4-301, which sets forth the "midnight-deadline rule":

>     "(a) If a payor bank settles for a demand item other than a documentary draft presented otherwise than for immediate payment over the counter before midnight of the banking day of receipt, the payor bank may revoke the settlement and recover the settlement if, before it has made final payment and before its midnight deadline, it
>
>         "(1) returns the item; or
>
>         "(2) sends written notice of dishonor or nonpayment if the item is unavailable for return.

19

"(b) If a demand item is received by a payor bank for credit on its books, it may return the item or send notice of dishonor and may revoke any credit given or recover the amount thereof withdrawn by its customer, if it acts within the time limit and in the manner specified in subsection (a).

"(c) Unless previous notice of dishonor has been sent, an item is dishonored at the time when for purposes of dishonor it is returned or notice sent in accordance with this section.

"(d) An item is returned:

"(1) As to an item presented through a clearing house, when it is delivered to the presenting or last collecting bank or to the clearing house or is sent or delivered in accordance with clearing-house rules; or

"(2) In all other cases, when it is sent or delivered to the bank's customer or transferor or pursuant to instructions."

Paragraph 3 of the Official Comment to § 7-4-301 explains the relationship between § 7-4-215 and § 7-4-301:

"3. The relationship of Section 4-301(a) to final settlement and final payment under Section 4-215 is illustrated by the following case. Depositary Bank sends by mail an item to Payor Bank with instructions to settle by remitting a teller's check drawn on a bank in the city where Depositary Bank is located. Payor Bank sends the teller's check on the day the item was presented. Having made timely settlement, under the deferred posting provisions of Section 4-301(a), Payor Bank may revoke that settlement by returning the item before its midnight deadline. If it fails to return the

item before its midnight deadline, it has finally paid the item if the bank on which the teller's check was drawn honors the check. But if the teller's check is dishonored there has been ... no final payment under Section 4-215(b). Since the Payor Bank has neither paid the item nor made timely return, it is accountable for the item under Section 4-302(a)[5]."

The final-payment rule and the midnight-deadline rule operated to make Troy Bank, the payor bank, liable for the full face amount of the check when it paid the underencoded amount of the check pursuant to § 7-4-215 (setting forth the final-payment rule) and did not dishonor the check within the

---

[5]Section 7-4-302(a), Ala. Code 1975, states:

"(a) If an item is presented to and received by a payor bank, the bank is accountable for the amount of:

"(1) A demand item, other than a documentary draft, whether properly payable or not, if the bank, in any case in which it is not also the depositary bank, retains the item beyond midnight of the banking day of receipt without settling for it or, whether or not it is also the depositary bank, does not pay or return the item or send notice of dishonor until after its midnight deadline; or

"(2) Any other properly payable item unless, within the time allowed for acceptance or payment of that item, the bank either accepts or pays the item or returns it and accompanying documents."

21

1130040

time prescribed in § 7-4-301 (setting forth the midnight-deadline rule). This conclusion is supported by the following secondary authorities and cases.

Lawrence's Anderson on the Uniform Commercial Code states:

> "Where the item was encoded in a smaller amount than for which it was drawn, if the payor bank does not dishonor the item, it will be accountable for the full amount of the item as drawn while having debited its customer's account only for the amount in which it was encoded. If the customer is insolvent, the payor bank may not be able to recover the full amount of the item from its customer. If this is the case, the depository bank will be liable to the payor bank for the difference."

§ 4-209:6 (emphasis added); see also 1 Henry J. Bailey & Richard B. Hagedorn, Brady on Bank Checks: The Law of Bank Checks § 21.04 (rev. ed. 2011)("[U]nder the UCC, it is clear that a payor bank remitting an insufficient amount on an underencoded check would be accountable for the full amount."); and Lawrence, Changes in Check Collection, 61 J. Kan. B.A. at 33 ("If the encoding is for less than the amount of the check, the payor bank is liable for the full amount of the check."). This is in accord with the Official Comment to § 7-4-209, which states, in pertinent part:

22

"If a drawer wrote a check for $25,000 and the depositary bank encoded $2,500, the payor bank becomes liable for the full amount of the check. The payor bank's rights against the depositary bank depend on whether the payor bank has suffered a loss. Since the payor bank can debit the drawer's account for $25,000, the payor bank has a loss only to the extent that the drawer's account is less than the full amount of the check. There is no requirement that the payor bank pursue collection against the drawer beyond the amount in the drawer's account as a condition to the payor bank's action against the depositary bank for breach of warranty."

§ 7-4-209, ¶ 2 (emphasis added); see also White & Summers, Uniform Commercial Code § 20-6c. ("The comment and [§ 4-209] seem to adopt the proposition that a payor who pays an underencoded amount has made final payment on the check or has liability for the full face amount to other parties. However, the payor can recover or set off any difference that it cannot get from its customer from the encoding depositary bank. Thus, the payor would first have to attempt to charge its depositor's account for the amount of the check and if it could not -- either because the account had been closed or there was a stop payment -- it would have a warranty claim against the depositary bank."); and Paul A. Carrubba, UCC Revised Articles 3 & 4: The Banker's Guide to Checks, Drafts and Other Negotiable Instruments 165 (Banker's Publ'g Co.

1993)("The payor of the item is allowed, under [§ 4-209], to look immediately and directly to the depository bank without first attempting to collect the proceeds from the payee of the check. If the check was written by the drawer for $10,000 but was encoded as $1,000, the payor could first attempt to charge the customer's account for the $9,000 underencoded amount. If the customer's bank account balance was not sufficient, the payor bank could look directly to the depository bank without first pursuing collection from the drawer.").

Moreover, in Azalea City Motels, Inc. v. First Alabama Bank of Mobile, 551 So. 2d 967, 976 (Ala. 1989), this Court held, under the then existing version of Alabama's UCC, relying upon Georgia Railroad Bank & Trust Co. v. First National Bank & Trust Co. of Augusta, 139 Ga. App. 683, 684-85, 229 S.E.2d 482, 484 (1976), as follows:

> "The UCC provides that the payor bank becomes accountable for an item upon paying the item. § 7-4-213(1).[6] Like our sister state of Georgia, we

---

[6]Section § 7-4-215 encompasses, with some revisions, the final-payment rule previously set forth in the now repealed § 7-4-213 (Act No. 95-668, Ala. Acts 1995, repealed what had been § 7-4-213 and enacted a new § 7-4-213, moving the substance of former § 7-4-213 to § 7-4-215). Prior to 1996, "[f]ormer Section 4-213(1)(c) provided that final payment occurred when the payor bank completed the 'process of posting.' [The process-of-posting test was] abandoned in

24

hold that the partial payment of the item by [the payor bank] constituted final payment within the meaning of § 7-4-213(3), so that the [payor] bank was rendered accountable for the full and proper amount of the item."

See also First Nat'l Bank of Boston v. Fidelity Bank, 724 F. Supp. 1168, 1172 (E.D. Pa. 1989) ("I reject the argument that the amount of the item for § 4-213(1) [pre-revised UCC] purposes is the encoded amount, rather than the face amount, of the check."); and Georgia R.R. Bank & Trust Co., 139 Ga. App. at 685, 229 S.E.2d at 484 (a case cited in the Official Comment to § 7-4-209 finding that "posting of the item, although in a smaller amount than the true amount of the item, was sufficient to constitute final payment [and] the payor bank became accountable for the amount of the item").[7]

---

[revised] Section 4-215(a) for determining when final payment is made."  § 7-4-215, Ala. Code 1975, Official Comment ¶ 5. Additionally, former § 4-213(1) provided that "[u]pon final payment under subparagraphs (b), (c) or (d) the payor bank shall be accountable for the amount of the item."  This sentence was deleted in revised § 7-4-215(a), Ala. Code 1975. The provision was thought to be "an unnecessary source of confusion," especially since the revised section deleted the process-of-posting test.  § 7-4-215, Ala. Code 1975, Official Comment ¶ 6.  A bank will still be accountable under § 7-4-302 if it "has neither paid the item nor returned it within its midnight deadline."  § 7-4-215, Ala. Code 1975, Official Comment ¶ 6.

[7]Referring to First National Bank of Boston, Azalea City and Georgia R.R. Bank & Trust Co., the United States District

1130040

In the present case, Ronnie Gilley Properties, LLC ("Gilley"), the drawer, issued a $100,000 check to Cile Way Properties, LLC ("Cile"). Cile deposited the check in its account at Citizens Bank, the depositary bank. Citizens Bank encoded the check in order to collect the funds from Gilley's bank -- Troy Bank, the payor bank. However, Citizens Bank incorrectly encoded the check for $1,000 instead of $100,000; Citizens Bank underencoded the check by $99,000. Therefore, when Troy Bank was presented with the check, it was encoded for $1,000, and Troy Bank paid Citizens Bank $1,000.[8] Troy Bank paid the check and at no time sought to dishonor the check. Therefore, pursuant to §§ 7-4-215, 7-4-301, and the

---

Court for the Western District of Pennsylvania stated in United States v. Zarra, 810 F. Supp. 2d 758, 767 (W.D. Pa. 2011):

"Important policies support these holdings. '[T]he Board [of Governors of the Federal Reserve System] believes that finality of payment and the discharge of the underlying obligation are fundamental and valuable features of the check collection process.' Collections of Checks and Other Items by Federal Reserve Banks, 70 Fed. Reg. 71218, 71221 (Nov. 28, 2005) (to be codified at 12 C.F.R. pts. 210 and 229)."

[8]At the time Troy Bank paid the underencoded amount of $1,000 to Citizens Bank, there were sufficient funds in Gilley's account to cover the full $100,000 amount of the check.

26

ample authority cited above, at the time Troy Bank paid the underencoded amount of $1,000, it became liable for the _full_ amount of the check -- $100,000 -- because it made payment on the check and did not dishonor the check within the midnight deadline.

Having concluded that Troy Bank became liable for the full amount of the check when it paid the underencoded amount of the check and did not revoke its settlement of the check by the midnight deadline, we now turn to whether the encoding warranty shifts liability from Troy Bank to Citizens Bank. Based on the principles set forth above, we conclude that the encoding warranty shifts liability to Citizens Bank.

Citizens Bank discovered its encoding error after Troy Bank had honored the check and had paid the underencoded amount. Citizens Bank then submitted to the Federal Reserve Bank the adjustment notice requesting that $99,000 be transferred from Troy Bank to Citizens Bank to cover the full amount of the check. At the time the Federal Reserve Bank transferred $99,000 from Troy Bank's Federal Reserve Bank account to Citizens Bank's Federal Reserve Bank account, Gilley's account no longer had sufficient funds to pay the

full amount of the check. After receiving notice that the Federal Reserve Bank had paid Citizens Bank's adjustment notice, Troy Bank discovered that Gilley's account no longer had sufficient funds to cover the full amount of the check and realized damage in the alleged amount of $98,436.43.[9]

It is important to note that had Citizens Bank properly encoded the check there would have been no damage. As set forth above, Gilley's account had sufficient funds to cover the full amount of the check when Troy Bank was presented with the check. However, Gilley all but emptied the checking account after the underencoded amount of $1,000 was withdrawn from its account so that, when Citizens Bank realized its error and sent the adjustment notice, there were no longer sufficient funds in Gilley's account to cover the full amount of the check. Citizens Bank's encoding error caused Troy Bank to incur damage.[10]

---

[9]Apparently, Troy Bank was able to recover $563.57 from Gilley's account.

[10]The purpose of a claim brought under the encoding warranty is to determine liability between banks for damage caused by an encoding error. Therefore, in considering Troy Bank's claim against Citizens Bank, Gilley's conduct is irrelevant.

1130040

Under the encoding warranty -- and in accordance with the Official Comment to § 7-4-209 and the above-quoted cases and secondary authorities -- it was error for the circuit court to enter a summary judgment in Citizens Bank's favor. As the Official Comment ¶ 2 to the encoding warranty states, "[t]here is no requirement that the payor bank pursue collection against the drawer beyond the amount in the drawer's account as a condition to the payor bank's action against the depositary bank for breach of warranty." Following the Federal Reserve Bank's payment of Citizens Bank's adjustment notice from Troy Bank's Federal Reserve Bank account, Troy Bank first looked to Gilley's account for the $99,000 that had been transferred to Citizens Bank. Gilley's account had been all but emptied and no longer had sufficient funds to cover the full amount of the check; thus, Troy Bank's damage, for which Citizens Bank is liable pursuant to the encoding warranty, is the difference between the $99,000 that was transferred from Troy Bank to Citizens Bank and the amount of funds in Gilley's account at that time.

The encoding warranty protects Troy Bank from any damage resulting from Citizens Bank's encoding error. Although Troy

29

Bank did not incur any damage at the time it honored the check by paying the underencoded amount of $1,000, Troy Bank certainly incurred damage when the adjustment notice was paid because Gilley's account no longer contained sufficient funds to cover the full amount of the check. The damage Troy Bank incurred was the result of Citizens Bank's encoding error. Had Citizens Bank properly encoded the check, Gilley's account would have contained sufficient funds to cover the full amount of the check when it was first presented to Troy Bank.

We note that Citizens Bank argues that its breach of the encoding warranty does not make it strictly liable for the alleged damage to Troy Bank but that its breach of the encoding warranty must have actually caused Troy Bank's alleged damage in order for Citizens Bank to be liable for the alleged damage. We agree and, as set forth above, have concluded that Citizens Bank's breach of the encoding warranty caused Troy Bank's alleged damage. Citizens Bank makes a strained argument that Troy Bank was under an obligation to "dishonor" the adjustment notice. See Citizens Bank's brief, at pp. 29-32. However, as set forth above, Troy Bank was already liable for the full amount of the check when Citizens

Bank sent the adjustment notice to the Federal Reserve Bank. Payment of the adjustment notice did not make Troy Bank liable for the full amount of the check; Troy Bank's payment of the underencoded amount of $1,000 made Troy Bank liable for the full amount of the check.[11]  The payment of the adjustment notice was inconsequential as to Troy Bank's liability.

In this case, the encoding warranty, which is applied to determine liability as between banks, operates to shift the liability to Citizens Bank.  To hold that Citizens Bank is not liable for the damage it caused Troy Bank based on Citizens Bank's encoding error would render the encoding warranty useless and strip Troy Bank of a legislatively enacted protection.[12]

------

[11]See Official Comment to § 7-4-209 and Lawrence's Anderson on the Uniform Commercial Code § 4-209:6, supra.

[12]We also note the following salient point made by Troy Bank:

> "As a practical matter, Citizens Bank's theory of a second midnight deadline [applying to the adjustment notice] would not only nullify § 7-4-209, but it would also require every bank to set up a system to potentially process the same check two (or possibly more) times. Rather than putting the risk on the party who can best bear it by properly encoding the check -- as the legislature has expressly done -- Citizens Bank's theory would provide a perverse incentive to game the system by

## Conclusion

Based on the foregoing, we conclude that the circuit court erred in its application of the law to the undisputed facts of this case. Citizens Bank's initiation of the claim

---

misencoding a check and then having multiple opportunities for it to clear."

Troy Bank's brief, at p. 22 (footnote omitted). Citizens Bank relies upon U.S. Bank National Association v. First Security Bank, N.A., (No.2:97-CV-0789C, April 3, 2001) (D. Utah 2001)(not reported in F. Supp. 2d), to argue that any delay caused by Troy Bank in discovering that Gilley's account had insufficient funds to cover the full amount of the check should be taken into consideration in determining liability. That factor, however, is irrelevant in this case. In U.S. Bank, a payor bank's delay in looking to a drawer's account to cover the full amount of an underencoded check played a significant role in the court's decision because it was the payor bank's delay that allowed the drawer to empty his account. In this case, if any delay is relevant, it is Citizens Bank's delay in discovering its encoding error, which allowed Gilley time to empty its account before the adjustment notice was sent. By the time Troy Bank received the adjustment notice, Gilley's account had been all but emptied. Therefore, U.S. Bank is inapplicable to this case. Moreover, U.S. Bank is an unreported decision decided by the United States District Court of Utah; it is lacking in precedential value. Citizens Bank also relies upon First National Bank of Boston v. Fidelity Bank, National Association, 724 F. Supp. 1168 (E.D. Penn. 1989), for a similar principle. However, First National was decided by the United States District Court for the Eastern District of Pennsylvania in 1989, a year before the UCC was revised to include the check-encoding-warranty provisions, which Alabama later adopted. In First National, the court was dealing with a court-created equitable doctrine, not a statutory provision. Therefore, this Court will not consider U.S. Bank and First National.

procedure did not deprive Troy Bank of its statutory right to seek damages under the encoding warranty.  Under the encoding warranty, Citizens Bank is liable for the alleged damage to Troy Bank.  Accordingly, we reverse the circuit court's summary judgment and remand the cause for the circuit court to enter a summary judgment in favor of Troy Bank in the amount of damages supported by the substantial evidence.

REVERSED AND REMANDED.

Moore, C.J., and Stuart, Bolin, Main, and Bryan, JJ., concur.

Shaw, J., concurs in the result.

Murdock, J., dissents.